## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| WHITNEY MAIN, HENRY SCHMIDT and DANIEL GRENTZ, individually and as representatives of a class of similarly situated persons, and on behalf of the American Airlines, Inc., 401(k) Plan, | § § § § § § | |
| Plaintiffs, | § § | Case No. 4:16-cv-00473-O |
| v. | § § | **ORAL ARGUMENT REQUESTED** |
| AMERICAN AIRLINES INC., PENSION ASSET ADMINISTRATION COMMITTEE, BENEFITS STRATEGY COMMITTEE, PENSION BENEFITS ADMINISTRATION COMMITTEE, EMPLOYEE BENEFITS COMMITTEE, AND JOHN DOES 1-90, | § § § § § § § | |
| Defendants. | § § | |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR
## MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

Dee J. Kelly, Jr. (S.B. # 11217250)
Lars L. Berg (S.B. # 00787072)
KELLY HART & HALLMAN LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Tel.: (817) 332-2500
Fax: (817) 878-9280
dee.kelly.2@kellyhart.com
lars.berg@kellyhart.com

Brian D. Boyle (*admitted pro hac vice*)
(D.C. Bar # 419773)
Shannon M. Barrett (*admitted pro hac vice*)
(D.C. Bar # 476866)
Meaghan VerGow (*admitted pro hac vice*)
(D.C. Bar # 977165)
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
Tel.: (202) 383-5300
Fax: (202) 383-5300
bboyle@omm.com
sbarrett@omm.com
mvergow@omm.com

*Attorneys for Defendants*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................ 2

ARGUMENT ..................................................................................................................... 4

    I.     COUNT I SHOULD BE DISMISSED BECAUSE PLAINTIFFS'
            DISLOYALTY THEORY IS UNDERCUT BY THEIR OWN
            ALLEGATIONS AND THEY HAVE FAILED TO ALLEGE
            SUFFICIENT FACTS TO INFER AN IMPRUDENT FIDUCIARY
            PROCESS ............................................................................................... 5

          A.     Plaintiffs Have Failed To Allege A Viable Theory Of Disloyalty ............ 5

          B.     Plaintiffs' Imprudence Theories Do Not Support A Valid Claim
               For Relief ................................................................................... 9

                 1.     Defendants Had No Duty To Seek Out The Cheapest
                        Possible Index Funds ................................................... 11

                 2.     Plaintiffs Have Failed To State A Claim For The Failure To
                        Remove Underperforming Funds ................................. 13

                 3.     It Was Not Imprudent To Include Mutual Funds In The
                        Plan Lineup .................................................................. 21

                 4.     Count I Should, At A Minimum, Be Dismissed Against
                        The Defendants Not Responsible For The Selection Of The
                        Plan's Investment Options .......................................... 22

    II.    COUNT II SHOULD BE DISMISSED BECAUSE PLAINTIFFS FAIL
            TO STATE A CLAIM FOR THE BREACH OF THE DUTY TO
            MONITOR ............................................................................................ 24

CONCLUSION ................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page**

## CASES

*Armstrong v. LaSalle Bank Nat'l Ass'n,*
   446 F.3d 728 (7th Cir. 2006) ........................................................................... 9, 10

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009)............................................................................................... 6

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007).......................................................................................... 4, 9

*Braden v. Wal-Mart Stores, Inc.,*
   588 F.3d 585 (8th Cir. 2009) ............................................................................ 11

*Bunch v. W.R. Grace & Co.,*
   555 F.3d 1 (1st Cir. 2009) .................................................................................. 6

*Bussian v. RJR Nabisco, Inc.,*
   223 F.3d 286 (5th Cir. 2000) ............................................................................. 6

*Caterino v. Barry,*
   8 F.3d 878 (1st Cir. 1993).................................................................................. 10

*Chao v. Merino,*
   452 F.3d 174 (2d Cir. 2006)............................................................................... 10

*Coyne & Delany Co. v. Selman,*
   98 F.3d 1457 (4th Cir. 1996) ............................................................................ 25

*DeBruyne v. Equitable Life Assurance Soc'y,*
   920 F.2d 457 (7th Cir. 1990) ............................................................................ 13

*Fener v. Belo Corp.,*
   513 F. Supp. 2d 733 (N.D. Tex. 2007) ............................................................... 5

*Fifth Third Bancorp v. Dudenhoeffer,*
   134 S. Ct. 2459 (2014)....................................................................................... 10

*Hecker v. Deere & Co.,*
   556 F.3d 575 (7th Cir. 2009) .............................................................. 4, 8, 11, 21

*Howell v. Motorola, Inc.,*
   633 F.3d 552 (7th Cir. 2011) ............................................................................ 25

*Hozier v. Midwest Fasteners, Inc.,*
   908 F.2d 1155 (3d Cir. 1990).............................................................................. 23

## TABLE OF AUTHORITIES
### (continued)

Page

*In re Capstead Mortg. Corp. Sec. Litig.*,
  258 F. Supp. 2d 533 (N.D. Tex. 2003) ................................................................. 4

*Jenkins v. Yager*,
  444 F.3d 916 (7th Cir. 2006) ............................................................................. 20

*Johnson v. Ga.-Pac. Corp.*,
  19 F.3d 1184 (7th Cir. 1994) ............................................................................. 23

*Kopp v. Klein*,
  722 F.3d 327 (5th Cir. 2013) ............................................................................. 24

*Laborers Nat'l Pension Fund v. N. Trust Quantitative Advisors, Inc.*,
  173 F.3d 313 (5th Cir. 1999) ........................................................................ 10, 20

*Laboy v. Bd. of Trs. of Bldg. Serv. 32 BJ SRSP*,
  2012 WL 3191961 (S.D.N.Y. Aug. 7, 2012) ....................................................... 13

*Loomis v. Exelon Corp.*,
  658 F.3d 667 (7th Cir. 2011) ........................................................................ 20, 21

*New Orleans City v. Ambac Assurance Corp.*,
  815 F.3d 196 (5th Cir. 2016) .............................................................................. 4

*New Orleans Emp'rs Int'l Longshoremen's Ass'n, AFL-CIO Pension Fund v. Mercer
  Inv. Consultants*,
  635 F. Supp. 2d 1351 (N.D. Ga. 2009) ........................................................... 13, 20

*Oceaneering Int'l, Inc. v. Cross Logistics, Inc.*,
  2014 WL 2462810 (S.D. Tex. June 2, 2014) ........................................................ 5

*Pegram v. Herdrich*,
  530 U.S. 211 (2000) ........................................................................................ 23

*Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan
  Stanley Inv. Mgmt. Inc.*,
  712 F.3d 705 (2d Cir. 2013) .......................................................................... 10, 20

*Perez v. Bruister*,
  823 F.3d 250 (5th Cir. 2016) ............................................................................. 24

*Ramirez v. J.C. Penney Corp.*,
  2015 WL 5766498 (E.D. Tex. Sept. 29, 2015) .................................................... 24

*Renfro v. Unisys Corp.*,
  671 F.3d 314 (3d Cir. 2011) ............................................................................. 22

## TABLE OF AUTHORITIES
### (continued)

Page

*Rinehart v. Akers*,
    722 F.3d 137 (2d Cir. 2013)..................................................................................... 24

*Rinehart v. Lehman Bros. Holdings Inc.*,
    2016 U.S. App. LEXIS 5114 (2d Cir. Mar. 18, 2016).......................................... 24

*Taylor v. United Techs. Corp.*,
    2009 WL 535779 (D. Conn. Mar. 3, 2009) .......................................................... 21

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)................................................................................................. 4

*Tibble v. Edison Int'l*,
    135 S. Ct. 1823 (2015)............................................................................................. 9

*Tibble v. Edison Int'l*,
    729 F.3d 1110 (9th Cir. 2013) ................................................................. 11, 21, 22

*United States v. 50 Acres of Land, More or Less, Situated in Dallas Cnty., State of Tex.*,
    529 F. Supp. 220 (N.D. Tex. 1981) ....................................................................... 5

*Van Billiard v. Farrell Distrib. Corp.*,
    2009 WL 4729965 (D. Vt. Dec. 3, 2009) .............................................................. 5

## STATUTES

15 U.S.C. § 7241(a) ..................................................................................................... 22

15 U.S.C. § 80a-18(a)(1)-(f) ....................................................................................... 22

15 U.S.C. § 80a-8......................................................................................................... 22

26 U.S.C. § 851(b)(3) .................................................................................................. 22

29 U.S.C. § 1002(21) ............................................................................................. 22, 23

29 U.S.C. § 1108(b)(8) .................................................................................................. 7


## REGULATIONS

17 C.F.R. § 230.482(b)(3)(i)....................................................................................... 14

17 C.F.R. § 270.0-1(a)(7)............................................................................................ 22

17 C.F.R. § 270.38a-1 ................................................................................................. 22

**TABLE OF AUTHORITIES**
(continued)

Page

29 C.F.R. § 404c-1(b) ............................................................................................. 3

**FEDERAL REGISTER**

42 Fed. Reg. 18734, Prohibit Transaction Exemption 77-3, Class Exemption Involving
    Mutual Fund In-House Plans Requested by the Investment Company Institute
    (Apr. 8, 1977)....................................................................................................... 7

66 Fed. Reg. 35676-01, *In re Hillview Investment Trust II and Hillview Capital
    Advisors, LLC*, Investment Company Act Release No. 25055 (July 6, 2001)....................... 16

**OTHER AUTHORITIES**

American Beacon Funds, American Beacon Large Cap Growth Fund Summary
    Prospectus (Form 497k) (Mar. 1, 2011)................................................................. 15

American Beacon Funds, American Beacon Short-Term Bond Fund Summary
    Prospectus (Form 497k) (Mar. 1, 2011)................................................................. 17

American Beacon Funds, Certified Shareholder Report of Registered Management
    Investment Companies (Form N-CSR) (Jan. 1, 2013)............................................. 18

American Beacon Funds, Certified Shareholder Report of Registered Management
    Investment Companies (Form N-CSR) (Jan. 7, 2011)............................................. 15

American Beacon Funds, Certified Shareholder Report of Registered Management
    Investment Companies (Form N-CSR) (Mar. 9, 2015) ............................................. 8

American Beacon Funds, Certified Shareholder Report of Registered Management
    Investment Companies (Form N-CSR) (Mar. 10, 2016) ......................................... 16

American Beacon Funds, Certified Shareholder Report of Registered Management
    Investment Companies (Form N-CSR) (Sept. 7, 2012)............................................ 19

American Beacon Funds, Registration Statement Under the Securities Act of 1933
    (Form N-1A) (Feb. 27, 2009) .............................................................................. 15

American Beacon Funds, Registration Statement Under the Securities Act of 1933
    (Form N-1A) (May 4, 2010) ................................................................................ 18

Barclays, *Benchmark Definitions*.................................................................................. 18

Ben Baden, *When Will The Fed Finally Raise Rates?*, US News & World Rpt. (Apr. 28,
    2010) ................................................................................................................. 21

DFA Investment Dimensions Group, Inc., Certified Shareholder Report of Registered
    Management Investment Companies (Form N-CSR) (Jan. 9, 2012)...................................... 19

# TABLE OF AUTHORITIES
## (continued)

**Page**

Department of Labor, ABC Plan 401(k) Plan Fee Disclosure Form for Services Provided by XYZ Company ................................................................................................................. 11

Department of Labor, *Report of the Working Group on Exploring the Utilization of Third-Party Trustees to Protect Plan Participants* (Nov. 13, 1996) ........................................ 6

Fidelity Concord Street Trust, Registration Statement Under the Securities Act of 1933 (Form N-1A) (Apr. 29, 2015) .............................................................................................. 12

Financial Industry Regulatory Authority, *Duration—What an Interest Rate Hike Could Do to Your Bond Portfolio* (Mar. 2013)................................................................................ 17

Growth Fund of America, The Growth Fund of America Summary Prospectus (Form 497k) (Nov. 1, 2012).............................................................................................................. 15

Investment Company Institute, *Are S&P 500 Index Mutual Funds Commodities,* Perspective Vol. 11, No. 3 (Aug. 2005)................................................................................ 12

Morningstar, *The Morningstar Category Classifications* (Apr. 29, 2016) .................................. 16

Securities & Exchange Commission, *Beginners' Guide to Asset Allocation, Diversification, and Rebalancing* ........................................................................................... 17

Securities & Exchange Commission, *Bonds* ............................................................................. 17

Securities & Exchange Commission, *Invest Wisely: An Introduction to Mutual Funds* ............. 14

TIAA-CREF Funds, TIAA-CREF Short-Term Bond Fund Summary Prospectus (Form 497k) (Aug. 1, 2012)...................................................................................................... 18

Tom Lauricella, *A Safer Junk Strategy*, Wall St. J. (Oct. 3, 2012)............................................. 18

Vanguard Bond Funds, Certified Shareholder Report of Registered Management Investment Companies (Form N-CSR) (Mar. 1, 2012) .......................................................... 19

Vanguard Fixed Income Securities, Vanguard Short-Term Bond Index Fund Summary Prospectus (Form 497k) (Apr. 25, 2012) .............................................................................. 18

Vanguard Fixed Income Securities, Vanguard Short-Term Investment-Grade Fund Summary Prospectus (Form 497k) (May 30, 2012) .............................................................. 18

Wall Street Journal, *Economic Forecasting Survey*, Wall St. J. (Jan. 2011)................................ 21

Defendants[1] respectfully submit this memorandum in support of their motion to dismiss the Amended Complaint ("AC") for failure to state a claim under the Employee Retirement Income Security Act of 1974 ("ERISA").

## INTRODUCTION

Plaintiffs ask this Court to second-guess decisions by fiduciaries of the American Airlines 401(k) Plan regarding the menu of investment options made available to the Plan's participants. Plaintiffs' principal criticism is that some of the Plan's investment options were not the cheapest products available on the market. As numerous courts have explained, however, cheaper is not necessarily better, and fiduciaries have no duty to pursue rock-bottom prices at the expense of other considerations. Indeed, courts have applied that reasoning to dismiss one of the very theories that Plaintiffs press here—that the Plan fiduciaries were required to offer cheaper "institutional" investment products instead of mutual funds—recognizing that mutual funds offer advantages those other products do not. Similar logic precludes Plaintiffs' separate claim that the Plan's fiduciaries had a duty to pick the cheapest available "index" funds.[2]

Plaintiffs' remaining theory—that the Plan's fiduciaries should have immediately removed certain investment options from the Plan in the face of alleged underperformance—is likewise insufficient. ERISA does not require rashness. An investment strategy that trails in one set of economic conditions may thrive in others, and a prudent fiduciary can reasonably decide to monitor a fund's performance over the long term before deciding to remove it in favor of an alternative fund. Plaintiffs fail to take these possibilities into account, and their effort to infer an

---

[1] American Airlines, Inc. ("American Airlines"), the Pension Asset Administration Committee ("PAAC"), the Benefits Strategy Committee ("BSC"), the Pension Benefits Administration Committee ("PBAC"), and the Employee Benefits Committee ("EBC").

[2] "Index" or "passively managed" funds are designed to track the performance of a broad market index, like the S&P 500 index. AC ¶ 43. "Actively-managed" funds, in contrast, aim to exceed the performance of a market index by deploying securities selection skills. *Id.*

imprudent fiduciary process from the mere suggestion that the fiduciaries did not remove the challenged investment options as quickly as Plaintiffs insist they could have is inadequate.

Plaintiffs' bid to bolster their shopworn and invalid imprudence claims by wrapping them in a disloyalty theory likewise fails. Plaintiffs contend that the fiduciaries' investment decisions were driven by a desire to favor American Beacon—a one-time subsidiary of American Airlines, that served as investment manager of various Plan investment options at issue here. But the central premise of their disloyalty theory—that when American Airlines' parent sold American Beacon, it sweetened the deal by committing the Plan to the continued use of American Beacon's services—is undercut by the very materials that Plaintiffs rely on to assert it. Those materials show that American Airlines made any such commitment impossible by requiring an independent third-party fiduciary to approve any further Plan use of American Beacon services. Plaintiffs' other allegations, in turn, do nothing to raise Plaintiffs' disloyalty accusations above the level of base conjecture. The Amended Complaint should be dismissed accordingly.

## BACKGROUND

American Airlines sponsors a 401(k) plan known as the American Airlines, Inc. 401(k) Plan (the "Plan," formerly known as the "$uper $aver" plan). AC ¶¶ 18, 23; *see* Declaration of Shannon Barrett in Support of Defendants' Motion to Dismiss the Amended Complaint ("Barrett Decl.") Ex. A ("Plan SPD").[3] The Plan enables eligible American Airlines employees to save for retirement by investing a portion of their salary through individual Plan accounts among numerous options offered in the Plan's investment lineup. AC ¶¶ 21-22; Plan SPD, at AA-APP010-011; Barrett Decl. Ex. B ("Plan Form 5500s"), at AA-APP060-064, AA-APP074-078,

---

[3] The Court may consider documents incorporated into the Amended Complaint by reference (such as the Plan document and Summary Plan Description ("SPD")), and judicially noticeable materials (such as Forms 5500 filed with the Department of Labor ("DOL")). *See infra* at 4-5.

AA-APP088-092, AA-APP102-106, AA-APP115-121 (Plan investment lineup).  Individual Plan participants are responsible for deciding whether to invest, how much to invest (within IRS limits), and in which options to invest.  AC ¶¶ 21-22; Plan SPD, at AA-APP010-011.

Like other employer-sponsored retirement plans, the Plan is governed by ERISA.  AC ¶¶ 19-20.  DOL regulations encourage ERISA plan fiduciaries to make available at least three investment options with distinct risk and return profiles for participants to choose among.  29 C.F.R. § 404c-1(b).  The Plan included more than two dozen investment options, and made numerous others available through its self-directed brokerage window.  *See, e.g.*, AC ¶ 44; Plan SPD, at AA-APP0011; Plan Form 5500s, at AA-APP063-064, AA-APP077-078, AA-APP091-092, AA-APP106, AA-APP121.  These options ranged from, *inter alia*, domestic and international equity funds (including index funds), to bond funds with varying risk profiles.  *Id.*

Several Plan investment options are (and have been in the past) managed by American Beacon Advisors, Inc. ("American Beacon"), which was once wholly-owned by American Airlines' parent company, AMR Corp. ("AMR").  AC ¶ 4.  In 2008, AMR sold American Beacon to Lighthouse Holdings, Inc. ("Lighthouse").  *Id.*  As part of the sale, AMR acquired a "small equity stake" in Lighthouse.  *Id.* ¶ 59.  In connection with the sale, the Plan retained an independent third-party fiduciary that reviewed and approved the Plan's post-sale use of the American Beacon funds.  Barrett Decl. Ex. C ("IFS Letter"), at AA-APP122-139; AC ¶ 58.

In October 2015, as part of a corporate merger between AMR and US Airways Group Inc., most US Airways 401(k) plan participant accounts were transferred into the Plan, and the Plan fiduciaries revamped the Plan lineup to limit it to 26 investment options (rather than retaining the more than 60 distinct options that had been in one of the two plans).  Plan Form 5500s, at AA-APP121 (listing at least 28 Plan options); Barrett Decl. Ex. D ("2014 US Airways

Form 5500"), at AA-APP151 (listing at least 34 options in the US Airways 401(k) plan); Barrett Decl. Ex. E ("Plan Investment Guide"), at AA-APP194-195 (showing 26 options in overhauled Plan lineup). Various changes were also made to the Plan's fiduciary structure. Historically, the Plan fiduciary primarily responsible for the selection and monitoring of Plan investment options had been the PAAC, and PAAC members were appointed by the BSC. AC ¶¶ 24-25; Barrett Decl. Ex. F ("2009 Plan Document"), §§ 2.72, 12.2, 12.4; Barrett Decl. Ex. G ("2014 Plan Document"), §§ 2.19, 2.74, 12.2, 12.4. As part of the post-merger restructuring, however, the PAAC was dissolved (along with the P**B**AC—a fourth committee, previously responsible for, *inter alia*, the selection of Plan administrative service providers), and the EBC assumed responsibility for the selection and monitoring of Plan investment options.[4]

## ARGUMENT

For a complaint "to survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'" *New Orleans City v. Ambac Assurance Corp.*, 815 F.3d 196, 200 (5th Cir. 2016) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In ruling on such a motion, a court may consider, in addition to the pleadings, "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *see also Hecker v. Deere & Co.*, 556 F.3d 575, 582-83 (7th Cir. 2009) (considering supplements to incorporated summary plan descriptions because they "serve much the same purpose as the originals"). Judicially noticeable documents include public filings with the DOL or Securities & Exchange Commission ("SEC"). *See In re Capstead Mortg. Corp. Sec. Litig.*, 258 F. Supp. 2d 533, 543 n.2 (N.D. Tex. 2003) (considering SEC filings); *Van Billiard v. Farrell*

---

[4] AC ¶¶ 26-27; 2014 Plan Document §§ 2.75, 9.12, 12.3; Barrett Decl. Ex. H ("2015 Plan Document"), §§ 2.22, 12.2.

*Distrib. Corp.*, 2009 WL 4729965, at *2-3 (D. Vt. Dec. 3, 2009) (considering DOL filings). They also include documents describing the price of publicly-traded securities and the returns of their benchmarks. *See, e.g.*, *Fener v. Belo Corp.*, 513 F. Supp. 2d 733, 737 & n.2 (N.D. Tex. 2007) (noticing "a stock price chart"); *Oceaneering Int'l, Inc. v. Cross Logistics, Inc.*, 2014 WL 2462810, at *31 (S.D. Tex. June 2, 2014) (noticing "several published benchmarks").[5]

## I.   COUNT I SHOULD BE DISMISSED BECAUSE PLAINTIFFS' DISLOYALTY THEORY IS UNDERCUT BY THEIR OWN ALLEGATIONS AND THEY HAVE FAILED TO ALLEGE SUFFICIENT FACTS TO INFER AN IMPRUDENT FIDUCIARY PROCESS

Count I, which asserts that Defendants breached fiduciary duties by not removing allegedly imprudent investment options, combines three distinct claims: (1) that Defendants retained American Beacon index funds in the Plan's investment lineup when cheaper alternatives were available; (2) that they retained poor-performing actively-managed American Beacon funds in the lineup; and (3) that they included mutual funds (rather than separate accounts or collective trusts) as Plan investment options.  Plaintiffs seek to weave these claims together by theorizing that the fiduciaries' decisions to retain the challenged funds were driven by an overarching desire to favor American Beacon rather than serve the Plan's interests.  This disloyalty theory, however, amounts to no more than rank speculation that is undermined by the very materials on which Plaintiffs rely; each of Plaintiffs' theories of imprudence is insufficient as a matter of law.

### A.   Plaintiffs Have Failed To Allege A Viable Theory Of Disloyalty

Plaintiffs' effort to suggest that the Plan's fiduciaries were motivated to pursue American Beacon's interests over Plan participants' largely centers on their assertion that "discovery will show" that as a term of its sale of American Beacon to Lighthouse in 2008, AMR agreed to keep

---

[5] *See also United States v. 50 Acres of Land, More or Less, Situated in Dallas Cnty., State of Tex.*, 529 F. Supp. 220, 224 n.1 (N.D. Tex. 1981) (observing that courts have "taken [] notice of [benchmarks] such [] as the … Moody's Composite Index of Yield on Long Term Corporate Bonds"), *rev'd on other grounds*, 706 F.2d 1356 (5th Cir. 1983), *rev'd*, 469 U.S. 24 (1984).

various American Beacon funds in the Plan lineup.  AC ¶ 57.  But the Amended Complaint itself makes clear that this is baseless conjecture that the Court need not credit.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (explaining that Rule 8's plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully").  Plaintiffs cite as the basis for their assertion a press release reporting that "American Beacon will continue to provide a number of services for AMR and its affiliates, including … investment management services for American Airlines pension, 401(k) and other health and welfare plans."  AC ¶ 58 (emphasis omitted).  But, as the Amended Complaint itself reflects, the press release also disclosed that "[a]n independent third party reviewed and approved the continuing relationship between American Beacon and [the] American Airlines … plans to satisfy the fiduciary duties and other rules that apply to these plans."  *Id.*  The press release thus indicates that the Plan's fiduciaries took a course of action that courts and the DOL have lauded as an appropriate means for resolving potential conflicts of interest—turning the decision of whether to use the American Beacon funds over to an independent, third-party fiduciary, and thereby denying AMR the ability to promise the Plan's continued business as part of the sale.[6]  Far from indicating disloyalty, the press release relied on by Plaintiffs establishes sound and faithful fiduciary practice.[7]

---

[6] *See, e.g.*, *Bunch v. W.R. Grace & Co.*, 555 F.3d 1, 8 (1st Cir. 2009) ("[U]pon concluding that the decisions required of Grace management … augured a potential conflict of interest with Grace's fiduciary duties, Grace took the eminently correct decision of insulating itself from that possibility…. It [] delegated the relevant decisional power to an independent third party … to render its expert, unbiased assessment of the Grace stock, and to execute its autonomous determination."); *Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 299 (5th Cir. 2000) ("[T]he level of precaution necessary to relieve a fiduciary of the taint of a potential conflict should depend on the circumstances.… In some instances, the only open course of action may be to appoint an independent fiduciary."); DOL, *Report of the Working Group on Exploring the Utilization of Third-Party Trustees to Protect Plan Participants* (Nov. 13, 1996), https://www.dol.gov/ebsa/publications/3dparty.htm (explaining that "[t]he benefits of utilizing independent third-parties [as fiduciaries] include enhanced expertise, independence in decision-making regarding transactions

Plaintiffs also point out that AMR retained a "small equity stake" in Lighthouse.   AC ¶ 59.   But mere ownership by AMR of a small stake in American Beacon's parent does not signal disloyalty.   Indeed, in crafting ERISA and its surrounding regulatory structure, Congress and the DOL promulgated exemptions to ERISA's prohibited transaction rules that are specifically designed to allow plan investments in options managed not only by entities wholly-owned by the plan's sponsor but even by the plan sponsor itself.   *See* Prohibit Transaction Exemption ("PTE") 77-3, Class Exemption Involving Mutual Fund In-House Plans Requested by the Investment Company Institute, 42 Fed. Reg. 18734, 18735 (Apr. 8, 1977) (permitting, under stated conditions, the sale of mutual fund shares to a plan that covers employees of the mutual fund investment advisor's affiliates); ERISA § 408(b)(8), 29 U.S.C. § 1108(b)(8) (similar exception to prohibited transaction rules for pooled investment funds maintained by banks and insurance companies).   It makes no sense to assume that, in permitting plans to invest in options with which the plan sponsors have some connection, Congress intended for courts to infer disloyalty merely because a plan's fiduciaries make that election.   And such an inference makes even less sense here, where, as the Amended Complaint and the documents incorporated in it reflect, the decision to keep American Beacon funds post-sale was made by an independent fiduciary engaged by the Plan to make that determination.   *See supra*, at 3.

---

involving plan assets and a party in interest and additional safeguards over the flow of monies in and out of a plan together with cross-checks to ensure accuracy.").

[7] Plaintiffs attempt to blunt the significance of the independent fiduciary's review by asserting in a footnote that it was not a fiduciary at all, but instead an advisor to the company, not the Plan, and did its work under a "implicit understanding" that it was to "make the agreement look legitimate[.]"   AC ¶ 60 n.3.   This speculative theory, however, is directly contradicted by the independent fiduciary's retention agreement, which was with the Plan and under which the independent fiduciary formally accepted fiduciary responsibility.   IFS Letter, at AA-APP122-139.   Plaintiffs allege no facts to support their conjecture that the independent fiduciary willingly subjected itself to fiduciary risk by conducting a supposed "whitewash," AC ¶60 n.3.

Finally, Plaintiffs seek to gain traction for their claim from the number of American Beacon funds in the Plan's lineup, alleging that, at one point, "approximately half" of the Plan's investment options were American Beacon funds, but that "months after" Lighthouse sold American Beacon in 2015, all of those were removed from the Plan.  AC ¶¶ 4, 64.  But there is nothing unusual about a fiduciary selecting multiple funds from a single fund company.  As the Seventh Circuit explained in *Hecker*, "many prudent investors limit themselves to funds offered by one company and diversify within the available investment options."  *Hecker*, 556 F.3d at 586.  The fiduciaries here were not so restrictive.  In almost every actively-managed asset class, the fiduciaries offered both an American Beacon fund and an unaffiliated option so participants could construct a diversified portfolio without investing in any American Beacon fund.  Plan Form 5500s, at AA-APP063-064, AA-APP077-078, AA-APP091-092, AA-APP106, AA-APP121.  Nor can it be reasonably inferred that the fiduciaries stuffed American Beacon funds into the Plan lineup without regard to their individual merit.  To the contrary, the lineup excluded many American Beacon funds, including ones from asset classes otherwise included in the Plan.[8] And, when Plan fiduciaries removed the American Beacon Large Cap Growth fund in 2012, they declined to replace it with other American Beacon funds in the large-cap growth space.[9]

Plaintiffs' suggestion, in turn, that the fiduciaries abandoned American Beacon as an investment manager once it was sold by Lighthouse is wrong:  the Plan still includes multiple

---

[8] *Compare, e.g.*, Plan Form 5500s, at AA-APP121 (listing only 13 American Beacon funds as of December 31, 2014, and mid-cap growth and small-cap growth funds managed by other firms) *with* American Beacon Funds, Certified Shareholder Report of Registered Management Investment Companies (Form N-CSR) (Mar. 9, 2015) (excerpt attached as Barrett Decl. Ex. I, at AA-APP724) (showing American Beacon offered at least 31 funds as of Mar. 9, 2015, including a mid-cap growth fund and small-cap growth fund).

[9] *Compare* Ex. I, at AA-APP721 (noting existence of American Beacon Holland Large Cap Growth Fund) *with* Plan Form 5500s, at AA-APP091, AA-APP106, AA-APP121 (listing two other large-cap growth funds).

investment options managed in whole or part by American Beacon.  Plan Investment Guide, at AA-APP183, AA-APP187, AA-APP189.  To be sure, a number of American Beacon funds were removed from the Plan's lineup in Fall 2015, but so were many funds with no connection to American Beacon whatsoever.  After the corporate merger of AMR with US Airways Group Inc., most US Airways 401(k) plan transferred into the Plan effective October 2015.  *See supra*, at 3-4.  Rather than retain the more than 62 distinct investment options that had been in one of the two plans, the Plan's fiduciaries trimmed the Plan's investment option lineup to a more manageable universe of 26 core investment options.  *Id.*  Given this substantial streamlining, it is neither surprising nor suspect that a number of American Beacon funds were among the removed options.  *See Twombly*, 550 U.S. at 567 (a court may assume a lawful business practice where practice is at least equally compatible with alleged facts as illicit practice).

### B.   Plaintiffs' Imprudence Theories Do Not Support A Valid Claim For Relief

Stripped of Plaintiffs' baseless speculation concerning Defendants' motives, Plaintiffs' Count I reduces to a series of theories that Defendants acted imprudently by not removing Plan investment options when cheaper alternatives may have been available or when certain of the options experienced periods of alleged underperformance.  Plaintiffs, however, do not plead sufficient facts to establish imprudence under any of these theories.

A claim of fiduciary imprudence under ERISA requires a plaintiff to allege facts showing that the fiduciary did not act "with the care, skill, prudence, and diligence that a prudent person acting in a like capacity and familiar with such matters would use."  *Tibble v. Edison Int'l* ("*Tibble II*"), 135 S. Ct. 1823, 1828 (2015) (quotations omitted).  Fiduciary decision-making typically requires a "balancing of competing interests under conditions of uncertainty," and ERISA's duty of prudence does not seat fiduciaries on a "razor's edge" in striking that balance.  *Armstrong v. LaSalle Bank Nat'l Ass'n*, 446 F.3d 728, 733 (7th Cir. 2006); *see also Chao v.*

*Merino*, 452 F.3d 174, 182 (2d Cir. 2006) (noting that the prudent-person standard does not require a fiduciary to take "any particular course of action if another approach seems preferable" (quotation omitted)); *Caterino v. Barry*, 8 F.3d 878, 883 (1st Cir. 1993) (Breyer, J.) ("[W]e do not simply substitute our judgment for that of the trustees," but rather "review the trustees' decision at a distance").  Rather, the exercise of fiduciary discretion is reviewed "deferentially" for an "abuse of discretion," *Armstrong*, 446 F.3d at 733, in light of "the circumstances … prevailing at the time the fiduciary act[ed]," *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2471 (2014) (quotations omitted).  In short, a fiduciary's prudence is judged by process, not outcome.  *Laborers Nat'l Pension Fund v. N. Trust Quantitative Advisors, Inc.*, 173 F.3d 313, 317 (5th Cir. 1999) ("[T]he appropriate inquiry is whether the individual trustees, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment …." (quotation omitted)).

Where, as here, a complaint contains no allegations actually addressing the fiduciaries' decision-making process, a plaintiff can only survive dismissal by alleging facts that, if accepted as true, would show that a prudent fiduciary under like circumstances would not and could not have made the same investment decisions.  *See Dudenhoeffer*, 134 S. Ct. at 2473 (instructing that, in reviewing claims that fiduciaries failed to discontinue investment, courts must consider "whether the complaint has plausibly alleged that a prudent fiduciary in the defendant's position could not have concluded that stopping purchases … would do more harm than good"); *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 720 (2d Cir. 2013) (absent direct allegations of fiduciaries' decision-making, ERISA standard "generally requires the plaintiff to allege facts, accepted as true, showing that a

prudent fiduciary in like circumstances would have acted differently.").   The Amended Complaint fails that pleading standard.

              1.       *Defendants Had No Duty To Seek Out The Cheapest Possible Index Funds*

Plaintiffs' first imprudence theory is that the fiduciaries acted unwisely by including American Beacon index funds in the Plan lineup when cheaper alternatives were available on the market.   The theory fails because, as other courts have recognized, "nothing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund (which might, of course, be plagued by other problems)."   *Hecker*, 556 F.3d at 586; *see also Tibble v. Edison Int'l* ("*Tibble I*"), 729 F.3d 1110, 1136 (9th Cir. 2013), *vac'd on other grounds*, *Tibble II*, 135 S. Ct. 1823 (2015) (quoting same with approval); *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 596 n.7 (8th Cir. 2009) ("[W]e do not suggest that a claim is stated by a bare allegation that cheaper alternative investments exist in the marketplace.").   Cost is a factor in selecting investment options, but it is not the only one, nor need it be dispositive.   *See* DOL, ABC Plan 401(k) Plan Fee Disclosure Form for Services Provided by XYZ Company, http://www.dol.gov/ebsa/pdf/401 kfefm.pdf ("The service provider offering the lowest cost services is not necessarily the best choice for [a] plan." (emphasis omitted)).

Index funds are no exception to that principle.   While index funds "attempt[] to mimic the performance of a market index," AC ¶ 68, there may be differences in which index a manager aims to mimic, and managers aiming to mimic the same index may do so with different levels of precision.   *Cf.* AC ¶ 76 n.10 (noting "differences in indexing strategies").   For example, Plaintiffs' own data shows that the American Beacon Small Cap Index Fund and International Equity Index Fund more closely mimicked the performance of their respective benchmark index for extensive periods than did the relevant comparator funds whose managers Plaintiffs claim

had "more experience" and a "superior reputation[s]," *id.* ¶¶ 73, 77, 81.[10]  And, it should go without saying, that funds seeking to mimic ***different*** indices are fundamentally different funds. Yet, in their effort to identify supposedly superior index funds, Plaintiffs have cited at least two funds that track different indices than those tracked by their American Beacon counterparts.[11]

Strategy and performance, moreover, are not the only distinguishing features among competing index funds.  Index funds also differ in the services they provide investors and plans, general manager reputation, the terms the managers impose on plans seeking to add the funds to the lineup (*e.g.*, some firms might require a plan to use the firm as a recordkeeper in order to obtain a preferred share class with a lower expense ratio, and others might require the use of multiple firm-sponsored funds).[12]  Plaintiffs fail to meaningfully acknowledge these factors.  For example, they fault the fiduciaries for choosing the American Beacon International Equity Index Fund over a Fidelity fund.  But according to that fund's prospectus, the fund would not even have been available to the Plan unless the fiduciaries also replaced J.P. Morgan with Fidelity as the Plan recordkeeper.[13]  Plaintiffs' allegations reduce to the supposition that cheaper is necessarily better, and that the failure to seek out the fund with the lowest cost is always

---

[10] *See, e.g., id.* ¶ 76 (American Beacon deviated from MSCI EAFE Index by average of 57 basis points ("bps") per year between 2010 and 2012, whereas Vanguard deviated by 73 bps, and Fidelity by 68 bps); *id.* ¶ 80 (American Beacon deviated from Russell 2000 Index by average of 15 bps per year between 2010 and 2014, whereas TIAA-CREF deviated by 16 bps).

[11] *See, e.g., id.* ¶¶ 79-80 (comparing American Beacon Small Cap Index Fund, which tracks the Russell 2000 Index, with the Vanguard Small Cap Index Fund, which tracks the CRSP US Small Cap Index.); *id.* ¶ 75 (comparing the American Beacon International Equity Index Fund, which tracked the MSCI EAFE index, with the Vanguard Developed Market Index Fund, which stopped tracking that index in 2013).

[12] *Cf.* Investment Company Institute, *Are S&P 500 Index Mutual Funds Commodities,* Perspective Vol. 11, No. 3 (Aug. 2005), https://www.ici.org/pdf/per11-03.pdf (concluding that "S&P 500 index funds are not commodities" and describing possible reasons for fee differences).

[13] Fidelity Concord Street Trust, Registration Statement Under the Securities Act of 1933 (Form N-1A) (Apr. 29, 2015) (excerpt attached as Barrett Decl. Ex. J, at AA-APP730) ("Shares generally are available only to [plans] for which Fidelity provides recordkeeping services."); Plan Form 5500s, at AA-APP058 (listing J.P. Morgan as Plan recordkeeper).

indicative of an imprudent process.[14]  That position has been soundly rejected by other courts as invalid and insufficient.  Plaintiffs' claim that the Plan should have employed cheaper index funds should be dismissed.[15]

> 2.      *Plaintiffs Have Failed To State A Claim For The Failure To Remove Underperforming Funds*

Plaintiffs separately assert that the fiduciaries acted imprudently by not removing three allegedly poor-performing American Beacon funds from the Plan's lineup—or by not removing them as quickly as Plaintiffs contend they could have.  The implicit premise of this claim is that an investment fiduciary must assume from a fund's short-term underperformance that the fund is an unacceptable long-term investment, and that a fiduciary's failure to immediately remove the fund is itself sufficient indicia of an imprudent process.  Neither ERISA nor sound investment principles support that position.  *See New Orleans Emp'rs Int'l Longshoremen's Ass'n, AFL-CIO Pension Fund v. Mercer Inv. Consultants*, 635 F. Supp. 2d 1351, 1377 (N.D. Ga. 2009) (crediting testimony that it is appropriate to monitor an underperforming fund "for a period of

---

[14] Plaintiffs also attempt to suggest imprudence by pointing out that more large plans invested in some of the comparator funds.  Running with the pack, however, is neither a requirement nor a sign of prudence.  *DeBruyne v. Equitable Life Assurance Soc'y*, 920 F.2d 457, 465 (7th Cir. 1990) (explaining that assertions of what "typical" investment managers did "say little about the wisdom of" the defendant manager's investments).  Plaintiffs' comparisons, for example, fail to account for the availability of funds on particular recordkeeping platforms.

[15] Plaintiffs attempt to bolster their cheaper index fund claim by pointing out that the Plan fiduciaries removed the American Beacon index funds when they overhauled the Plan's lineup in October 2015.  The mere fact, however, that the fiduciaries, in response to dramatic changes in the Plan's size and participant base, chose to take a new course with the Plan's investments does not support an inference that the prior course was imprudent.  "Allegations regarding subsequent, prudent conduct do not serve as evidence that prior conduct was imprudent," and a fiduciary's "decision to change funds [does] not sustain allegations that [any fund] was an imprudent choice previously."  *Laboy v. Bd. of Trs. of Bldg. Serv. 32 BJ SRSP*, 2012 WL 3191961, at *3 (S.D.N.Y. Aug. 7, 2012) ("It would turn the law on its head were we to embrace a concept where a plaintiff could use allegations of prudent measures to prove a defendant's imprudence: a trustee might hesitate to replace a fund in its plan out of fears that such action could later be used to sustain a claim for breach of fiduciary duty."), *aff'd*, 513 F. App'x 78 (2d Cir. 2013).

time, to see whether its performance might improve" and rejecting challenge to retention of fund that underperformed benchmark on three-year trailing basis in consecutive years); *cf.* SEC, *Invest Wisely: An Introduction to Mutual Funds*, https://www.sec.gov/investor/pubs/inwsmf.htm ("A fund's past performance is not as important as [one] might think…. [R]ankings, and ratings often emphasize how well a fund has performed in the past.  But studies show that the future is often different.  This year's 'number one' fund can easily become next year's below average fund."). As the SEC requires investment managers to caution investors, past performance does not guarantee future results, 17 C.F.R. § 230.482(b)(3)(i), and a fiduciary does not act unreasonably in deciding to monitor a fund that has experienced short-term underperformance for a future period of time before deciding to remove it, or in following a reasoned belief that a fund is likely to rebound as economic conditions change.  Plaintiffs fail to take account of such considerations, and their request that the Court infer imprudence from the mere fact that the fiduciaries retained certain funds during a period of underperformance has no legal basis.

These failings are plainly evident in Plaintiffs' challenge to the Plan's use of the American Beacon Large Cap Growth Fund.  Plaintiffs say nothing about the nature of the fund, offer no theory as to why the fund underperformed, and suggest no reason why any underperformance was a sign of longer-term concerns.  Rather, they merely allege that the fund had lower returns than its peers and benchmark at a particular point in time, and that the fiduciaries should have removed it from the Plan then and there.  AC ¶ 93.  Review of the fund's performance at other points in time, however, reveals the danger of inferring an imprudent monitoring process merely from such point-in-time observations.  While Plaintiffs chose to measure performance as of mid-2010, AC ¶ 91, a fiduciary evaluating the fund's performance as of year-end 2010—just a few months later—would have seen that the fund had not only

outperformed the only actively-managed alternative identified by Plaintiffs (the American Funds Growth Fund of America) by over 310 bps that year,[16] but also outperformed the Lipper Large Cap Growth Fund Index[17] in two of the past three years, including in 2010.[18]   Although the fund turned downward the next year, the fiduciaries removed it from the Plan by mid-2012, and Plaintiffs offer no facts from which the Court can infer that the intervening period was an unreasonable amount of time to monitor the fund for signs of recovery.   Plaintiffs' pleading is particularly vacuous given the time required for the fiduciaries to identify a replacement fund and provide notice to participants before a change.   Moreover, according to judicially-noticeable SEC disclosures, the Large Cap Growth Fund was a "manager-of-managers" fund in which American Beacon selected skilled sub-advisors to manage the portfolio; these disclosures establish that American Beacon itself had taken steps to address underperformance concerns by replacing one of the fund's sub-advisors just a year prior to Plaintiffs' suggested removal date.[19]

---

[16] Plaintiffs also compare the American Beacon Large Cap Growth Fund to the Vanguard Growth Index Fund, a passively-managed index fund.   AC ¶ 92.   The Plan, however, already offered a suite of index funds, including in the large cap space.   *See supra*, at 4.   The American Beacon Large Cap Growth Fund offered participants the option of active management; the Vanguard Growth Index Fund would not have offered them a similar choice.

[17] As explained in American Beacon's SEC filings, which used the Lipper Large-Cap Growth Funds Index as a comparator for the American Beacon Large Cap Growth Fund, "Lipper is an independent mutual fund research and ranking service," and the Index "tracks the results of the 30 largest mutual funds in the Lipper Large-Cap Growth Funds category."   American Beacon Funds, Registration Statement Under the Securities Act of 1933 (Form N-1A) (Feb. 27, 2009) (excerpt attached as Barrett Decl. Ex. K, at AA-APP743 n.2).

[18] American Beacon Funds, American Beacon Large Cap Growth Fund Summary Prospectus (Form 497k) (Mar. 1, 2011) (excerpt attached as Barrett Decl. Ex. L, at AA-APP747) (showing American Beacon fund returns of 15.39% in 2010 and -39.13% in 2008, and Lipper Index returns of 15.13% in 2010); Ex. K, at AA-APP741-742 (showing Lipper Index returns of minus 41.39% in 2008); Growth Fund of America, The Growth Fund of America Summary Prospectus (Form 497k) (Nov. 1, 2012) (excerpt attached as Barrett Decl. Ex. M, at AA-APP751) (showing Growth Fund of America returns of 12.28% in 2010).

[19] *See* American Beacon Funds, Certified Shareholder Report of Registered Management Investment Companies (Form N-CSR) (Jan. 7, 2011) (excerpt attached as Barrett Decl. Ex. N, at AA-APP757-759) (noting replacement of Goldman Sachs as fund manager); *id.* (explaining that

These changes would have provided prudent fiduciaries further reason to monitor the fund for signs of recovery before making a final removal decision.

Judicially noticeable facts concerning the American Beacon Treasury Inflation-Protected Securities ("TIPS") Fund's performance are equally revealing of the shortcoming in Plaintiffs' "underperformance equals imprudence" approach. Whatever underperformance the TIPS Fund may have reported as of year-end 2011, it performed well in later years: As of the end of 2015 (shortly before the filing of this suit), the fund was outperforming the Morningstar inflation-protected bond fund average over both 1-year, and 5-year trailing periods, and its average annual return of 3.35% over the trailing 10-year period was more than 10% greater than the Morningstar average of 3.01%.[20] Had Plan fiduciaries reacted rashly in 2011—as Plaintiffs suggest they were required to do—participants would have lost the benefit of that period of strong performance.

_____

American Beacon uses a "manager of manager structure" for all of its funds, wherein American Beacon "oversee[s] the provision of all investment advisory, [and] fund management" services, but fund assets "are managed [by] multiple investment advisors which have entered into separate … agreements with" American Beacon.) The manager-of-manager structure allows the fund manager to itself change its underlying portfolio management team on short notice, providing investors the opportunity to obtain different investment management without incurring the costs of switching funds. *See In re Hillview Investment Trust II and Hillview Capital Advisors, LLC*, Investment Company Act Release No. 25055, 66 Fed. Reg. 35676–01, at 35676 (July 6, 2001).

[20] *Compare* American Beacon Funds, Certified Shareholder Report of Registered Management Investment Companies (Form N-CSR) (Mar. 10, 2016) (excerpt attached as Barrett Decl. Ex. O, at AA-APP765) (showing the American Beacon fund's 1-, 5-, and 10-year trailing returns as of Dec. 31, 2015, were -0.10%, 1.61%, and 3.35%, respectively) *with* BlackRock, Inflation Protected Bond Fund (excerpt attached as Barrett Decl. Ex. P, at AA-APP767) (showing the Morningstar Inflation-Protected Bond Fund category average 1-, 5-, and 10-year trailing   returns as of Dec. 31, 2015, were -2.36%, 1.55%, and 3.01%, respectively). Morningstar classifications, such as the "Inflation-Protected Bond Fund" category, "help investors make meaningful comparisons between mutual funds …. by breaking portfolios into peer groups based on their holdings." Morningstar, *The Morningstar Category Classifications* (Apr. 29, 2016) (excerpt attached as Barrett Decl. Ex. Q, at AA-APP777). Morningstar assigned the "Morningstar TIPS Index" cited by Plaintiffs (AC ¶ 94 n.19) as an index for the "Inflation-Protected Bond" fund category, *id.* AA-APP779, but the index is not investable, and so is of little relevance in determining if the fiduciaries should have taken an alternative course of action.

Plaintiffs' point-in-time approach is not the only flaw in their challenge to the Plan's use

of the TIPS Fund.  Plaintiffs' attacks on both that fund and the American Beacon Short-Term

Bond ("STB") Fund combine the error of viewing a fund's performance without consideration of

the fund's strategy or structure, with the mistake of assessing fiduciary decision-making through

a hindsight lens.  One of the key investment factors Plaintiffs ignore in criticizing those funds is

risk.  Any investment must strike a balance between maximizing potential returns and

minimizing risk (or volatility),[21] and American Beacon's public filings reflect that both its STB

and TIPS funds had accepted a mandate to remain on the conservative end of the spectrum for

their respective asset classes.  For example, the STB Fund's summary prospectus explained that

the fund would only invest in "investment grade" bonds (as compared to higher-risk/higher-

return "high-yield" bonds),[22]  and that American Beacon would seek to "maintain a duration of

one to three years" for the fund—"duration" being a measure of "how much the price of [the]

bond investment is likely to fluctuate when there is an up or down movement in interest rates."[23]

The higher a fixed income portfolio's average duration, the more the market value of the

portfolio will fall in response to an increase in interest rates.  Thus, by maintaining a low average

duration, American Beacon insulated the STB Fund against the effects of a sudden interest rate

---

[21] SEC, *Beginners' Guide to Asset Allocation, Diversification, and Rebalancing*, https://www
.sec.gov/investor/pubs/assetallocation.htm (explaining risk-reward tradeoff).

[22]   SEC,   *Bonds*,   https://www.investor.gov/investing-basics/investment-products/bonds
(explaining difference between "investment-grade" and "high-yield" bonds); American Beacon
Funds, American Beacon STB Fund Summary Prospectus (Form 497k) (Mar. 1, 2011) (excerpt
attached as Barrett Decl. Ex. R, at AA-APP783 (The Fund will only buy debt securities that are
determined by the Manager to be investment grade at the time of purchase.").

[23] Ex. R, at AA-APP783 ("Under normal circumstances, the Fund seeks to maintain a
duration of one to three years.  A duration of 'one year' means that a security's price would be
expected to decrease by approximately 1% with a 1% increase in interest rates."); Financial
Industry Regulatory Authority, *Duration—What an Interest Rate Hike Could Do to Your Bond
Portfolio*  (Mar.  2013),  https://www.finra.org/investors/alerts/duration-what-interest-rate-hike-
could-do-your-bond-portfolio (explaining relationship between duration and interest rate risk).

hike.  Managers operating under less restrictive STB mandates were able to take on more risk.

As reflected in the financial press, many STB managers responded to the historically low interest

rates that existed in the wake of the financial crisis by dialing up risk—for instance, by including

higher-risk/higher-return "high-yield" bonds in their portfolios.[24]

The more conservative mandates for these American Beacon funds are reflected in their

published performance benchmarks.  For instance, whereas the funds Plaintiffs cite as

alternatives to the STB Fund used the  "Barclays 1-5 Yr Govt/Credit Index" as a benchmark[25]—

an index of debt securities "with maturities of one to five years"[26]—the published prospectus

benchmark for the American Beacon fund was one of debt securities "with maturities between

one and three years,"  Ex. S, at AA-APP793, matching its shorter duration mandate.  The fund's

performance against that disclosed benchmark was impressive:  as of year-end 2011, for

example, the STB Fund's returns were greater than the returns of that index in two of the three

previous  years  (including  by  almost  40%  in  2009).[27]   Similarly,  whereas  American  Beacon

---

[24]  American Beacon Funds, Certified Shareholder Report of Registered Management Investment Companies (Form N-CSR) (Jan. 1, 2013) (excerpt attached as Barrett Decl. Ex. S, at AA-APP795) (explaining that in deciding to renew the management agreement for the fund in 2012, the "Trustees considered the [fund's] performance relative to its benchmark because the peer universe median and Lipper Index include many funds that invest a large percentage of their assets in high yield securities, whereas the [fund] may invest only in investment-grade securities"); *see also* Tom Lauricella, *A Safer Junk Strategy*, Wall St. J. (Oct. 3, 2012), http://www.wsj.com/articles/SB10000872396390044481310457801683025790765 0 (explaining popularity of short-term high-yield bond funds in low-interest-rate post-financial-crisis period).

[25]  Vanguard Fixed Income Securities, Vanguard Short-Term Investment-Grade Fund Summary Prospectus (Form 497k) (May 30, 2012) (excerpt attached as Barrett Decl. Ex. T, at AA-APP799); TIAA-CREF Funds, TIAA-CREF Short-Term Bond Fund Summary Prospectus (Form 497k) (Aug. 1, 2012) (excerpt attached as Barrett Decl. Ex. U, at AA-APP802); Vanguard Fixed Income Securities, Vanguard Short-Term Bond Index Fund Summary Prospectus (Form 497k) (Apr. 25, 2012) (excerpt attached as Barrett Decl. Ex. V, at AA-APP806).

[26]  Barclays, *Benchmark Definitions* 13 (excerpt attached as Barrett Decl. Ex. W, at AA-APP810).

[27]  *See* Ex. R, at AA-APP782-783 (showing Fund returns of 2.89% in 2010 and 5.04% in 2009, and index returns of 2.82% in 2010); American Beacon Funds, Registration Statement

managed the TIPS Fund's duration to match that of the fund's disclosed Barclays Capital 1-10 Year U.S. TIPS Index benchmark (an index with a ten year limit on the maturity of constituent bonds),[28] the alternative TIPS mutual funds cited by Plaintiffs disclosed benchmarks with no limit on the maturity of constituent bonds and employed strategies riskier than those of the already riskier benchmarks.[29]   Vanguard, for example, disclosed that its Inflation-Protected Securities Fund "benefited … from its relatively long average duration" which significantly exceeded (by 3.4 years) that of its Barclay Capital U.S. Aggregate Bond Index benchmark.[30]

Plaintiffs fail to explain why the Plan fiduciaries were compelled to reject as imprudent low-risk options for these fixed income strategies, and no explanation is imaginable.  Plaintiffs' bid to condemn these low-risk alternatives is particularly ill-founded inasmuch as the investment lineup arranged by the Plan's fiduciaries also included both higher risk and longer duration fixed income options.  Plan Form 5500s, at AA-APP063-064, AA-APP077-078, AA-APP091-092, AA-APP106, AA-APP121 (noting availability of range of fixed income options including a

---

Under the Securities Act of 1933 (Form N-1A) (May 4, 2010) (excerpt attached as Barrett Decl. Ex. X, at AA-APP820) (showing index returns of 3.83% in 2009).

[28] American Beacon Funds, Certified Shareholder Report of Registered Management Investment Companies (Form N-CSR) (Sept. 7, 2012) (excerpt attached as Barrett Decl. Ex. Y, at AA-APP824-826) (explaining that the "Barclays Capital 1-10 Yr. U.S. TIPS Index is an unmanaged market index comprising U.S. Treasury inflation-indexed securities with maturities between one and ten years while the Barclays Capital U.S. TIPS Index includes all maturities," and that the "Fund's average modified duration was generally in-line" with the former).

[29] One of the alternative TIPS options cited by Plaintiffs (the SSgA U.S. Inflation-Protected Bond Index) is a passively-managed collective trust, not a mutual fund. AC ¶ 95.  As explained, *infra*, at 21-22, there are numerous reasons a fiduciary might choose to use mutual funds rather than other investment vehicles, like collective trusts.

[30] Vanguard Bond Funds, Certified Shareholder Report of Registered Management Investment Companies (Form N-CSR) (Mar. 1, 2012) (excerpt attached as Barrett Decl. Ex. Z, at AA-APP830); *see also* DFA Investment Dimensions Group, Inc., Certified Shareholder Report of Registered Management Investment Companies (Form N-CSR) (Jan. 9, 2012) (excerpt attached as Barrett Decl. Ex. AA, at AA-APP834-837) (listing benchmark for DFA Inflation-Protected Securities Fund as Barclays Capital U.S. Treasury Inflation Protected Securities Index, and noting average portfolio maturity of 9.37 years).

high-yield bond fund and two longer-duration bond fund options).  Plaintiffs' prudence claims regarding these funds thus distill to the contention that the Plan fiduciaries were required to offer participants seeking fixed income investment funds *only* higher-risk strategies in each asset class.  There is no basis for this kind of claim in ERISA.  As courts have stressed, there is nothing inherently imprudent about a plan fiduciary's decision to offer *some* fixed income options that protect against volatility, rather than *exclusively* more aggressive options.  *Jenkins v. Yager*, 444 F.3d 916, 925-26 (7th Cir. 2006) (explaining that, despite "years of lower performance," "investment strategy" of "find[ing] long-term, conservative, reliable investments that would do well during market fluctuations" was neither "unreasonable [n]or imprudent"); *Loomis v. Exelon Corp.,* 658 F.3d 667, 673-74 (7th Cir. 2011) (stating that, given ERISA's encouragement of participant choice, fiduciaries cannot be faulted for offering participants investment options with a range of risk/return profiles).

While it may seem clear today that the Plan could have achieved greater returns by only offering STB and TIPS funds that followed higher-risk strategies, that conclusion can only be made in hindsight—a plainly improper basis for judging fiduciary decisions.  *See Laborers Nat'l Pension Fund*, 173 F.3d at 317 (ERISA's prudence test is "not a test of the result of performance of the investment." (citation omitted)); *St. Vincent*, 712 F.3d at 716 ("[W]e judge a fiduciary's actions based upon information available to the fiduciary at the time of each investment decision and not from the vantage point of hindsight…." (quotation omitted)); *New Orleans Emp'rs*, 635 F. Supp. 2d 1372 ("The results of the fiduciary's investment decision are not the focus of the inquiry.  Rather, the fiduciary's conduct is to be evaluated …. without the benefit of hindsight." (citation omitted)).  For example, if in recent years the Federal Reserve had elected to allow the historically low short-term interest rates to move back toward more normal levels, longer

duration funds would have suffered while conservative funds (like the American Beacon funds) would have been better positioned.[31]  That history did not unfold in this way does not mean that investment in funds that guarded against the risk of an interest rate spike, and against other risks, was imprudent.  Plaintiffs' attack on the STB and TIPS Funds does no more than point out in hindsight that conservatively-managed funds underperformed in economic conditions that disfavored conservatively-managed funds.  That does not support an inference of imprudence.

### 3. It Was Not Imprudent To Include Mutual Funds In The Plan Lineup

Plaintiffs' final Count I claim is that it was imprudent to include mutual funds as Plan investment options rather than invest in lower-cost separate accounts or collective trusts.  AC ¶¶ 100-106.  Here again, Plaintiffs' theory rests on the false premise that fiduciaries must pursue the cheapest investments to the exclusion of all other considerations.  Courts have not only squarely rejected that premise—they have rejected the very categorical attack on the inclusion of mutual funds in plan lineups that Plaintiffs press here.[32]

As those courts have recognized, mutual funds offer advantages that the institutional products cited by Plaintiffs generally do not.  Unlike many institutional products, "brand-name mutual funds are generally easy to track via newspaper or internet sources."  *Tibble I*, 729 F.3d at 1134.  Mutual funds are also uniquely subject to intense regulatory schemes designed to ensure

---

[31] Financial trade press articles from 2010 through 2014 revealed sharp, continuous divisions of opinion on whether the Federal Reserve would allow short-term interest rates to rise in the near term.  *See, e.g.*, Wall Street Journal, *Economic Forecasting Survey*, Wall St. J. (Jan. 2011), http://projects.wsj.com/econforecast/#ind=fed_ funds&r=16&e=87 (Select "2011-01-01" edition and select "Download data") (asking "When will the Fed begin raising rates?" to which 37% of surveyed economists predicted 2011 and 55% predicted 2012); Ben Baden, *When Will The Fed Finally Raise Rates?*, US News & World Rpt. (Apr. 28, 2010), http://money.usnews.com/money/blogs/fund-observer/2010/04/28/when-will-the-fed-finally-raise-rates- ("No one is certain when the Fed will increase rates ….").

[32] *See, e.g.*, *Loomis v. Exelon Corp.*, 658 F.3d 667, 671-73 (7th Cir. 2011); *Hecker*, 569 F.3d at 711; *Taylor v. United Techs. Corp.*, 2009 WL 535779, at *10 (D. Conn. Mar. 3, 2009), *aff'd*, 354 F. App'x 525, 527 (2d Cir. 2009).

oversight and transparency.[33]   Given these recognized mutual fund advantages, it cannot reasonably be inferred that separate accounts (or other non-mutual fund products) are unquestionably superior—or that offering mutual fund options is inherently imprudent—just because separate accounts are allegedly less expensive.  Indeed, ERISA *expressly contemplates* plan investments in mutual funds, ERISA § 3(21)(B), 29 U.S.C. § 1002(21)(B), reflecting Congress's judgment that such options are not categorically imprudent 401(k) investments.

Plaintiffs try to salvage their claim by asserting, in conclusory fashion, that Defendants did not "adequately investigate [the use of] nonmutual fund alternatives such as collective trusts and separately managed accounts."  AC ¶ 100.  But the mere presence of mutual funds in the lineup—the only relevant fact alleged—does not provide plausible support for that inference.  Thus, Plaintiffs offer no more than a dressed-up version of the categorical attack on mutual funds that other courts have rejected.  That attack should be rejected here as well.

4.      *Count I Should, At A Minimum, Be Dismissed Against The Defendants Not Responsible For The Selection Of The Plan's Investment Options*

For the reasons already stated, Count I should be dismissed against all Defendants.  Short of that, it should, at a minimum, be dismissed as to American Airlines, the PBAC, and the BSC.  Under ERISA, a person is only a fiduciary "to the extent" that:

(i) he exercises any discretionary authority or discretionary control respecting

---

[33] *See, e.g.*, *Tibble I*, 729 F.3d at 1134 ("Mutual funds, however, have a variety of unique regulatory and transparency features that make it an apples-to-oranges comparison to judge them against [separate accounts and commingled trusts].");  *Renfro v. Unisys Corp.*, 671 F.3d 314, 318 (3d Cir. 2011) (mutual funds "are subject to a variety of reporting, governance, and transparency requirements that do not apply to other investment vehicles").   Mutual funds provide: (1) transparency, with disclosure of risks, performance, fees, and fund holdings, 15 U.S.C. §§ 80a-8; SEC Form N-1A, https://www.sec.gov/about/forms/formn-1a.pdf; (2) governance by a board, the majority of whose members must be independent of the adviser, 17 C.F.R. § 270.0-1(a)(7); (3) substantive regulation, such as requiring diversification and limiting leverage, 15 U.S.C. § 80a-18(a)(1)-(f); 26 U.S.C. § 851(b)(3); and (4) an SEC-regulated compliance regime, including written compliance procedures, 15 U.S.C. § 7241(a); 17 C.F.R. § 270.38a-1.

management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A).   Because a person is a fiduciary only "to the extent" it performs fiduciary functions, a fiduciary as to one function is not necessarily a fiduciary as to others. *Pegram v. Herdrich*, 530 U.S. 211, 225-26 (2000).[34]   Thus, "[i]n every case charging breach of ERISA fiduciary duty … the threshold question is … whether [the defendant] was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint."   *Id.* at 226.

While Plaintiffs assert that American Airlines, the PBAC, and the BSC were fiduciaries, they allege no facts suggesting that any of them had fiduciary responsibility over the selection or removal of the Plan's investment options.   Rather, that authority was specifically assigned to the PAAC and, later, the EBC.   *See* AC ¶ 24 ("The PAAC's authority to appoint investment managers gave it responsibility for selecting, monitoring, and removing investment options within the Plan."); *id.* ¶ 27 ("The EBC is also responsible for selecting and monitoring the Plan's administrative service providers, including the Plan's recordkeeper and trustee"); *see also* 2009 Plan Document, § 12.2; 2014 Plan Document, § 12.2; 2015 Plan Document, § 12.2.   Because American Airlines, the PBAC, and the BSC had no authority over the selection or removal of Plan investment options, they cannot be liable as fiduciaries for not removing the allegedly imprudent funds.

---

[34] *Johnson v. Ga.-Pac. Corp.*, 19 F.3d 1184, 1188 (7th Cir. 1994) ("A person 'is a fiduciary to the extent that' he performs one of the described duties; people may be fiduciaries when they do certain things but be entitled to act in their own interests when they do others."); *Hozier v. Midwest Fasteners, Inc.*, 908 F.2d 1155, 1158 (3d Cir. 1990) ("Fiduciary duties under ERISA attach not just to particular persons, but to particular persons performing particular functions.").

## II.   COUNT II SHOULD BE DISMISSED BECAUSE PLAINTIFFS FAIL TO STATE A CLAIM FOR THE BREACH OF THE DUTY TO MONITOR

In Count II, Plaintiffs seek to hold American Airlines, and the BSC liable under a theory that they failed to monitor other Plan fiduciaries.  AC ¶¶ 126-32.  But, although some courts have recognized a fiduciary duty by the entities that appoint fiduciaries to monitor those they appoint, the Fifth Circuit recently stated in *Perez v. Bruister*, 823 F.3d 250, 260 n.10 (5th Cir. 2016), that it "has never recognized this theory of ERISA fiduciary liability" and "did not approve" of the district court's holding that the defendant breached a fiduciary duty by appointing trustees and knowing that those trustees had breached their fiduciary duties.

This Court, however, need not adjudicate the existence of a duty to monitor in order to dismiss Count II.  As the Fifth Circuit recognized in an earlier opinion, to the extent a duty to monitor claim may be said to exist, it is a derivative claim that depends on an underlying breach by the monitored fiduciary.  *See, e.g.*, *Kopp v. Klein*, 722 F.3d 327, 344 (5th Cir. 2013) (dismissing "derivative" claim for breach of duty to monitor fiduciaries along with underlying claims), *vac'd on other grounds*, 134 S. Ct. 2900 (2014).[35]  For the reasons addressed above with respect to Count I, Plaintiffs have failed to allege sufficient facts to establish any such underlying breach and thus, like Count I, Count II should be dismissed.

But even if Plaintiffs' allegations were sufficient to state a claim under Count I (they are not), those allegations would still be insufficient to state a claim for breach of the duty to

---

[35] *See also Rinehart v. Akers*, 722 F.3d 137, 154 (2d Cir. 2013) ("Plaintiffs cannot maintain a claim for breach of the duty to monitor by the Director Defendants absent an underlying breach of the duties imposed under ERISA by the Benefit Committee Defendants."), *vac'd on other grounds*, 134 S. Ct. 2900 (2014), *and reaffirmed by Rinehart v. Lehman Bros. Holdings Inc.*, 2016 U.S. App. LEXIS 5114, at *17 (2d Cir. Mar. 18, 2016); *Ramirez v. J.C. Penney Corp.*, 2015 WL 5766498, at *3 (E.D. Tex. Sept. 29, 2015) ("Breach of the duty to monitor is a derivative claim; the fiduciary being monitored must have committed an underlying breach of duty in order for the monitoring fiduciary to be held liable under this theory.").

monitor.  Courts recognizing a duty to monitor have made clear that that "responsibility" does not "expose[] the appointing fiduciary to open-ended liability."  *Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1466 n.10 (4th Cir. 1996) (noting that "courts have properly taken a restrictive view of the scope of this duty and its attendant potential for liability.").  The Seventh Circuit, for example, recognized a duty to monitor but emphasized that the duty should not be interpreted to require an appointing entity to "review all business decisions" of the appointed fiduciaries, pointing out that such "standard would defeat the purpose of having trustees appointed to run a benefits plan in the first place."  *Howell v. Motorola, Inc.*, 633 F.3d 552, 573 (7th Cir. 2011). But that is precisely the standard that Count II suggests.  Plaintiffs seek to infer inadequate monitoring from the mere alleged facts that the Count II Defendants did not remove either the challenged investment options or the PAAC or EBC members responsible for their selection and retention.  AC ¶ 130.  Plaintiffs, however, allege no facts indicating how the Count II Defendants could have concluded that the PAAC or the EBC was imprudent in retaining those options short of engaging in the very type of investment-decision-by-investment-decision review that would defeat the purpose of assigning investment responsibility to a particular committee in the first place.  Accordingly, even if Plaintiffs have adequately alleged the retention of an imprudent investment option, they have failed to adequately allege a duty to monitor.

## CONCLUSION

Defendants respectfully requests that the Court dismiss the Amended Complaint with prejudice.

Respectfully submitted,


Dated:  August 5, 2016                  */s/ Lars L. Berg*_____
                                        Dee J. Kelly, Jr. (S.B. # 11217250)
                                        Lars L. Berg (S.B. # 00787072)
                                        KELLY HART & HALLMAN LLP
                                        201 Main Street, Suite 2500
                                        Fort Worth, Texas 76102
                                        Tel.: (817) 332-2500
                                        Fax: (817) 878-9280
                                        dee.kelly.2@kellyhart.com
                                        lars.berg@kellyhart.com


                                        Brian D. Boyle (*admitted pro hac vice*)
                                        (D.C. Bar # 419773)
                                        Shannon M. Barrett (*admitted pro hac vice*)
                                        (D.C. Bar # 476866)
                                        Meaghan VerGow (*admitted pro hac vice*)
                                        (D.C. Bar # 977165)
                                        O'MELVENY & MYERS LLP
                                        1625 Eye Street, N.W.
                                        Washington, D.C. 20006
                                        Tel.: (202) 383-5300
                                        Fax: (202) 383-5300
                                        bboyle@omm.com
                                        sbarrett@omm.com
                                        mvergow@omm.com


                                        *Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

On August 5, 2016, a true and correct copy of the foregoing document was served upon all persons who have requested notice and service of pleadings in this case via the Court's CM/ECF system.

*/s/ Lars L. Berg*
Lars L. Berg