## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | |
|---|---|
| Whitney Main, Henry Schmidt, and Daniel Grentz, individually and as representatives of a class of similarly situated persons, and on behalf of the American Airlines, Inc., 401(k) Plan,<br><br>         Plaintiffs,<br><br>v.<br><br>American Airlines, Inc., American Beacon Advisors, Inc., Pension Asset Administration Committee, Benefits Strategy Committee, Pension Benefits Administration Committee, Employee Benefits Committee, Beverly Goulet,  Laura Einspanier, Brian Mcmenamy, Peter Warlick, Carolyn Wright, Mark Burdette, Jeffrey Brudage, Tom Del Valle, Elise Eberwein, Daniel Garton, Bella Goren, Thomas Horton, Stephen Johnson, Derek Kerr, Craig Kreeger, Denise Lynn, Jim Ream, Robert Reding, Jon Snook, Virasb Vahidi, and Michael Carreon,<br><br>         Defendants. | **Case No. 4-16-cv-473-O**<br><br><br>**SECOND AMENDED COMPLAINT – CLASS ACTION** |

## NATURE OF THE ACTION

1.      Plaintiffs Whitney Main, Henry Schmidt, and Daniel Grentz ("Plaintiffs"), individually and as representatives of the Class described herein, and on behalf of the American Airlines, Inc. 401(k) Plan (formerly known as $uper $aver, a 401(k) Capital Accumulation Plan for Employees of Participating AMR Corporation Subsidiaries) (the "Plan"), bring this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA"), against Defendants American Airlines, Inc. ("American Airlines"); American Beacon, Advisors, Inc. ("American Beacon"); the Pension Asset Administration Committee ("PAAC"); the Benefits Strategy Committee ("BSC"); the Pension Benefits Administration

1

Committee ("PBAC"); the Employee Benefits Committee ("EBC"); and Beverly Goulet, Laura

Einspanier, Brian Mcmenamy, Peter Warlick, Carolyn Wright, Mark Burdette, Jeffrey Brudage,

Tom Del Valle, Elise Eberwein, Daniel Garton, Bella Goren, Thomas Horton, Stephen Johnson,

Derek Kerr, Craig Kreeger, Denise Lynn, Jim Ream, Robert Reding, Jon Snook, Virasb Vahidi,

and Michael Carreon (the "Individual Defendants") (collectively, "Defendants").   As described

herein, Defendants have breached their fiduciary duties and engaged in unlawful self-dealing

with respect to the Plan in violation of ERISA, to the detriment of the Plan and its participants

and beneficiaries.   Plaintiffs bring this action to remedy this unlawful conduct, prevent further

mismanagement of the Plan, and obtain equitable and other relief as provided by ERISA.

## PRELIMINARY STATEMENT

2.      ERISA imposes strict fiduciary duties of loyalty and prudence upon employers

and other plan fiduciaries. 29 U.S.C. § 1104(a)(1).  These twin fiduciary duties are "the highest

known to the law."  *In re Enron Corp. Securities, Derivative & ERISA Litig.*, 284 F. Supp. 2d

511, 550 (S.D. Tex. 2003) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982)).

Fiduciaries must act "solely in the interest of the participants and beneficiaries."  29 U.S.C. §

1104(a)(1).

3.      Defendants do not act in the best interest of the Plan and its participants.  Instead,

Defendants have used the Plan as an opportunity to promote the business interests of American

Airlines, its parent company, and American Beacon at the expense of the Plan and its

participants.

4.      In 1986, American Airlines' parent company at that time, AMR Corp. ("AMR"),

started a mutual fund company named American AAdvantage Funds.  In 2008, AMR sold the

company (now called American Beacon Funds) for $480 million to Lighthouse Holdings, Inc.,

and obtained an ownership stake in Lighthouse Holdings, Inc.  As part of the deal (and in return for this sizeable consideration), it was agreed that "American Beacon will continue to provide… investment management services for American Airlines pension, 401(k) and other health and welfare plans." American Airlines Press Release, Sept. 15, 2008, *available at* http://hub.aa.com/en/nr/pressrelease/amr-corporation-completes-sale-of-american-beacon-advisors-inc-to-lighthouse-holdings-inc-an-affiliate-of-pharos-capital-group-llc-and-tpg-capital-lp.  And that is just what happened: American Beacon served as a fiduciary and investment manager for the Plan, and prioritized the use of its mutual funds ahead of the interests of Plan participants. Accordingly, since the sale of American Beacon, approximately half of the Plan's designated investment alternatives have been American Beacon Funds, and thirteen American Beacon Funds remained in the Plan until the fall of 2015, when the Plan was overhauled and every American Beacon fund was removed from the Plan.  The Plan's use of American Beacon funds have generated profits for American Beacon and American Airlines, and made the funds appear more competitive in the marketplace than they really were, and allowed American Beacon to achieve economies of scale so as to offer lower prices to attract other clients. Not coincidentally, this Plan overhaul that removed the American Beacon funds occurred approximately three months after Lighthouse Holdings, Inc. sold its interest in American Beacon Funds in a deal that closed in the second quarter of 2015.

5.     The American Beacon Funds have been largely imprudent holdings that should have been removed from the Plan.  For example, between early 2010 and the end of 2014, the Plan has had between $300 million and $1.2 billion invested in the American Beacon S&P 500 Index Fund (which mimics the S&P 500 index), even though the fees for that index fund were at all times **six to eight times higher** than a comparable index fund from Vanguard that had the

identical mix of investments.  Despite the obvious imprudence of this American Beacon index fund, Defendants retained this fund in the Plan until the fall of 2015 (when it was belatedly removed), costing Plan participants millions of dollars in excess investment management fees. Similarly, the Plan retained the American Beacon International Equity Index Fund in the Plan despite the fact that an *identical* index fund was available from Fidelity that charged less than a third of what the American Beacon fund charged.  And again, despite the obvious imprudence of American Beacon's international index fund in 2010, Defendants retained this fund in the Plan until the fall of 2015, costing Plan participants millions of dollars in excess investment management fees.

6.     In addition, the Plan had hundreds of millions of dollars invested in other actively-managed American Beacon funds that were retained in the Plan despite their obvious imprudence.  For example, at the end of 2011, the Plan had approximately $160 million invested in the American Beacon Treasury Inflation Protected Securities Fund.  The fund clearly had become imprudent by that time, significantly underperforming its benchmark index over the past one-, three-, and five-year periods, while ranking in the bottom half of its category over the same time periods.  A prudent fiduciary would have removed this fund, given its consistent underperformance, but the Plan's fiduciaries failed to take this action until the fall of 2015, long after the fund had become imprudent, costing Plan participants millions of dollars in lost earnings they would have enjoyed had the Plan's fiduciaries moved to a prudent inflation-protected bond mutual fund.

7.     As another example, the Plan held the American Beacon Large Cap Growth Fund until it was liquidated in mid-2012.  Yet this fund clearly had become imprudent much earlier. As of mid-2010, for example, the American Beacon Large Cap Growth Fund had

4

underperformed its benchmark index by at least three percent a year over the past one-, three-, and five-year periods, while ranking in the bottom 30% of its category over all three time periods.  An impartial and prudent fiduciary would have removed the fund from the Plan at this time.  However, the Plan's fiduciaries failed to remove the fund from the Plan until it was closed in mid-2012, and in the subsequent two years, the American Beacon Large Cap Growth Fund, very predictably, underperformed its benchmark index by at least four percent per year, costing Plan participants millions in lost earnings.

8.     Tellingly, in August 2015, American Beacon announced that "due to large redemptions which are expected to occur by the end of 2015 that will substantially reduce the Fund's asset size," it would be closing seven of its mutual funds, including all four of the funds mentioned above.  American Beacon Funds, Prospectus Supplement, Aug. 20, 2015, *available at* https://www.sec.gov/Archives/edgar/data/809593/000080959315000053/liquidation082015.htm. An eighth American Beacon fund held by the Plan was closed in January 2016 for similar reasons.  In other words, the majority of the American Beacon funds held by the Plan were complete failures in the marketplace, so much so that when the Plan announced it would be moving out of these funds, American Beacon was forced to liquidate them.  Had the Plan's fiduciaries been unbiased and unconflicted, rather than beholden to the terms of AMR's sale of American Beacon Funds and American Beacon's self-interested investment management advice, they would have acted in the same manner as the rest of the marketplace, and removed these funds from the Plan many years earlier.  Their failure to do so cost Plan participants tens of millions of dollars in excessive fees and lost earnings.

9.     Finally, Defendants failed to investigate the use of separate accounts and collective trusts as alternatives to mutual funds, even though they are typically less expensive

and offer the same types of investments.  These investment alternatives provide larger plans the ability to negotiate lower fees than a mutual fund generally offers.  Had the Plan's fiduciaries investigated the possibility of using collective trusts or separate accounts, they could have significantly reduced investment management expenses while using materially identical investments.

10.     These imprudent investment choices were not the result of mere negligence or oversight.  To the contrary, Defendants continued to hold American Beacon Funds within the Plan long after they had become imprudent so as to further the financial interests of American Airlines and its parent corporation, as well as the financial interests of the Plan's investment manager, American Beacon.  By doing so, Defendants breached their duty of loyalty, as well as their duty of prudence, in violation of 29 U.S.C. § 1104.

11.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duties of loyalty and prudence (Count One), and the failure to monitor Plan fiduciaries (Count Two).

**JURISDICTION AND VENUE**

12.     Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a)(2) and (3), which provide that participants in an employee retirement plan may pursue a civil action on behalf of the plan to remedy breaches of fiduciary duties and other prohibited conduct, and to obtain monetary and appropriate equitable relief as set forth in 29 U.S.C. §§ 1109 and 1132.

13.     This case presents a federal question under ERISA, and therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1)(F).

14.     Venue is proper pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because this is the district where the plan is administered, where the breaches of fiduciary duties giving rise to this action occurred, and where Defendants may be found.

## THE PARTIES

### PLAINTIFFS

15.     Plaintiff Whitney Main resides in Claremore, Oklahoma and is a current participant in the Plan.  Over the past six years, Main has been invested in the majority of the Plan's designated investment alternatives both through the individual mutual funds he selected and through his investments in the Conservative, Moderate, and Aggressive Pre-Mixed Portfolios made available to Plan participants.  Main has suffered financial harm and has been injured by Defendants' unlawful conduct as described herein.

16.     Plaintiff Henry Schmidt resides in Lyndhurst, Ohio, and is a former participant in the Plan.  Schmidt's participation in the Plan ended when his Plan assets were transferred into the Envoy Air Inc. 401(k) Plan.  Schmidt is nonetheless entitled to receive benefits from the Plan in the amount of the difference between the value of his account as of the time his account was transferred and what his account would have been worth at that time had Defendants not violated ERISA as described herein.  Schmidt was invested in several of the Plan's designated investment alternatives, including at least two American Beacon funds.  Schmidt has suffered financial harm and has been injured by Defendants' unlawful conduct as described herein.

17.     Plaintiff Daniel Grentz resides in San Diego, California, and is a current participant in the Plan.  Over the past six years, Grentz has invested in a variety of the Plan's designated investment alternatives, including one or more funds within the American Beacon family of mutual funds.  Grentz has suffered financial harm and has been injured by Defendants'

unlawful conduct as described herein.

THE PLAN

18.     The Plan is a retirement plan for employees of American Airlines and participating subsidiaries of its parent corporation.  This includes all American Airlines agent, management, and support staff employees, Transport Worker Union employees, and flight attendants.    There have been three versions of the Plan Document in effect in the six years prior to the filing of this action.  On January 1, 2009, American Airlines executed the Plan Document amending and restating the Plan, which the Plan Document titled "$uper $aver An American Airlines, Inc. 401(k) Capital Accumulation Plan for Employees of Participating AMR Corporation Subsidiaries".  On January 3, 2014, American Airlines executed the Plan Document amending and restating the Plan, and changing its title to "$uper $aver An American Airlines, Inc. 401(k) Capital Accumulation Plan".  Finally, on October 14, 2015, American Airlines amended and restated the Plan effective October 27, 2015, now titled "American Airlines, Inc. 401(k) Plan".  By executing each Plan Document, American Airlines created the PAAC, PBAC, BSC, and EBC, and granted or confirmed to each of them authority to manage and administer the Plan and the Plan's investments, as described below.  Likewise, through its 2014 and 2015 Plan amendments and restatements, American Airlines demonstrated its authority to reauthorize or remove Plan fiduciaries throughout the relevant time period.

19.     The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A) and a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34).

20.     The Plan is a qualified plan under 26 U.S.C. § 401, and is of the type commonly referred to as a "401(k) plan."

21.     The Plan is a defined-contribution plan, a type of employee retirement plan in

which employees invest a percentage of their earnings on a pre-tax basis.  The employer often matches those contributions up to a certain percentage of the compensation contributed by the employee each pay period.  Within the Plan, employees may defer anywhere from 1% to 100% of their compensation on a pre-tax basis (subject to annual contribution limits), and American Airlines matches those contributions up to either 2.5% or 5.5% of the employee's salary, depending on the type of employee.  Employees who do not make an election to contribute to the Plan are automatically enrolled at a 3% contribution level.

22.     Participants in a defined-contribution plan are responsible for directing the investment of these contributions, choosing from among a lineup of options offered by the Plan. Investment Company Institute, A Close Look at 401(k) Plans, at 9 (Dec. 2014), *available at* https://www.ici.org/pdf/ppr_14_dcplan_profile_401k.pdf (hereinafter "ICI Study").  As a result, the investment lineup determined by the Plan's fiduciaries is critical to participants' investment results and ultimately the retirement benefits they receive.

**DEFENDANTS**

*American Airlines*

23.     American Airlines is the "plan sponsor" within the meaning of 29 U.S.C. § 1002(16)(B).  American Airlines is headquartered in this district, and is a subsidiary of American Airlines Group, Inc., formerly known as AMR Corp.  Up until a recent amendment of the Plan, American Airlines has been the Plan Administrator, with general oversight responsibilities for the entire Plan.  As Plan Administrator, American Airlines was a fiduciary.  *See* 29 C.F.R. § 2509.75-8 at D-3.  American Airlines was also a named fiduciary pursuant to 29 U.S.C. § 1102(a).  Further, under the prior versions of the Plan, American Airlines, through its corporate officer, was responsible for appointing and removing members of the BSC. Under the most

recent version of the Plan, American Airlines, through its corporate officer, is responsible for appointing and removing members of the EBC.   These appointment and monitoring duties carried a corresponding duty to take action upon discovery that the BSC and EBC were not performing their duties properly and in accordance with ERISA.   These duties and responsibilities conferred fiduciary status upon American Airlines pursuant to 29 U.S.C. § 1002(21)(A).  *See In re Enron Corp. Securities, Deriv. & ERISA Litig.*, 284 F. Supp. 2d 511, 553 (S.D. Tex. 2003) (collecting cases) ("A person or entity that has the power to appoint, retain and/or remove a plan fiduciary from his position has discretionary authority or control over the management or administration of a plan and is a fiduciary to the extent that he or it exercises that power.").   Additionally, as the Plan sponsor, Plan Administrator, and entity responsible for appointing and removing members of the BSC and EBC, American Airlines had knowledge of the fiduciary breaches committed by the other Defendants, and did not make reasonable efforts under the circumstances to remedy those breaches.

*PAAC*

24.    During a large portion of the relevant period, prior to the most recent amendment to the Plan, the PAAC was named by the Plan as being responsible for selecting and appointing the Plan's trustees and investment managers.   The PAAC was therefore a named fiduciary pursuant to 29 U.S.C. § 1102(a).  The PAAC's authority to appoint investment managers gave it responsibility for selecting, monitoring, and removing investment options within the Plan. Pursuant to these authorized duties and functions, the PAAC exercised discretionary control respecting management of the Plan; exercised authority or control respecting management or disposition of Plan assets; and had discretionary authority or responsibility in administration of the Plan.  The PAAC and its members were therefore functional fiduciaries of the Plan pursuant

to 29 U.S.C. § 1002(21)(A).

**BSC**

25.     During a large portion of the relevant period, prior to the most recent restatement of the Plan, the BSC was responsible for approving material amendments to the Plan, and appointing the members of the PAAC and PBAC.  The responsibility for appointing members of the PAAC and PBAC carried with it a responsibility to monitor the performance of the individuals, to ensure they were carrying out their duties properly.  Furthermore, that monitoring duty carried with it a duty to take prompt remedial action upon discovery that the PAAC and PBAC were not performing their duties properly and in accordance with ERISA.  These duties and responsibilities conferred fiduciary status upon the BSC pursuant to 29 U.S.C. § 1002(21)(A).  *See In re Enron Corp.*, 284 F. Supp. 2d at 553.

**PBAC**

26.     During a large portion of the relevant period, prior to the most recent amendment to the Plan, the PBAC was responsible for the general operation of the Plan and for the selection of administrative service providers.  In this capacity, the PBAC was given overall responsibility for administering the Plan.  Accordingly, the PBAC had discretionary authority or discretionary control respecting management of the Plan as well as discretionary authority and responsibility regarding administration of the Plan, and was therefore a Plan fiduciary pursuant to 29 U.S.C. § 1002(21)(A).  Through its role in administering the Plan, the PBAC had knowledge of the fiduciary breaches committed by the other Defendants, but made no reasonable efforts under the circumstances to remedy those breaches.

**EBC**

27.     The Plan has been amended within the past two years, and the new Plan

11

Document names a different set of Plan fiduciaries.  The current Plan Document names EBC as the Plan Administrator.  In this role, the EBC is responsible for selecting, monitoring, and removing the Plan's designated investment alternatives.  The EBC is also responsible for selecting and monitoring the Plan's administrative service providers, including the Plan's recordkeeper and trustee.  More broadly, the EBC has general oversight responsibility for the operation of the Plan.  The EBC is a named fiduciary under the Plan and pursuant to 29 U.S.C. § 1102(a).  The EBC also exercises discretionary authority and discretionary control respecting management of the Plan, administration of the Plan, and management and disposition of the Plan's assets, and therefore is also a fiduciary pursuant to 29 U.S.C. § 1002(21)(A).

***Committee Members***

28.     Defendant Beverly Goulet is currently Executive Vice President and Chief Integration Officer of American Airlines, and has served in various executive roles at American Airlines since 2010. Ms. Goulet was a member of the PACC from 2010 to 2012, of the PBAC from 2010 to 2013, of the BSC from 2013 to 2014, and of the EBC from 2014 to at least 2015.

29.     Defendant Laura Einspanier was Vice President of Employee Relations at American Airlines. Ms. Einspanier was a member of the PAAC from 2012 to 2013 and of the PBAC from 2012 to 2013.

30.     Defendant Brian McMenamy is Vice President of Finance at American Airlines. Mr. McMenamy was a member of the PAAC from 2010 to 2013, of the PBAC from 2010 to 2013, and of the EBC from 2014 to at least 2015.

31.     Defendant Peter Warlick is Vice President of Treasury at American Airlines. Mr. Warlick was a member of the PAAC and PBAC in 2013.

32.     Defendant Carolyn Wright is Vice President of Customer Planning at American

Airlines. Ms. Wright was a member of the PAAC from 2010 to 2011 and of the PBAC from 2010 to 2012.

33.     Defendant Mark Burdette was Vice President of Employee Relations at American Airlines. Mr. Burdette was a member of the PBAC from 2010 to 2011.

34.     Defendant Jeffrey Brundage was Senior Vice President of Human Resources at American Airlines. Mr. Brundage was a member of the BSC from 2010 to 2011.

35.     Defendant Tom Del Valle was Senior Vice President of Airport Services at American Airlines. Mr. Del Valle was a member of the BSC from 2010 to 2011.

36.     Defendant Elise Eberwein is Executive Vice President of People and Communications at American Airlines. Ms. Eberwein was a member of the BSC from 2013 to 2014 and of the EBC from 2014 to 2015.

37.     Defendant Daniel Garton was Executive Vice President of Marketing at American Airlines. Mr. Garton was a member of the BSC in 2010.

38.     Defendant Bella Goren was a Senior Vice President and Chief Financial Officer of American Airlines. Ms. Goren was a member of the BSC from 2011 to 2013.

39.     Defendant Thomas Horton was on the BSC in 2010. At the time he was on the BSC, Horton was serving as Executive Vice President of Finance and Planning and Chief Financial Officer of American Airlines.

40.     Defendant Stephen Johnson is Executive Vice President of Corporate Affairs at American Airlines. Mr. Johnson was a member of the BSC from 2013 to 2014.

41.     Defendant Derek Kerr is an Executive Vice President and Chief Financial Officer of American Airlines. Mr. Kerr was a member of the BSC from 2013 to 2014 and a member of the EBC from 2014 to at least 2015.

42.     Defendant Craig Kreeger was Senior Vice President of Customer Experience at American Airlines. Mr. Kreeger was a member of the BSC from 2011 to 2012.

43.     Defendant Denise Lynn was Senior Vice President of People at American Airlines. Ms. Lynn was a member of the BSC from 2012 to 2013.

44.     Defendant Jim Ream was Senior Vice President of Operations at American Airlines. Mr. Ream was a member of the BSC from 2012 to 2013.

45.     Defendant Robert Reding was Executive Vice President of Operations at American Airlines. Mr. Reding was a member of the BSC from 2010 to 2011.

46.     Defendant Jon Snook was Senior Vice President of Customer Service at American Airlines. Mr. Snook was a member of the BSC in 2013.

47.     Defendant Virasb Vahidi was a Senior Vice President and Chief Commercial Officer at American Airlines. Mr. Vahidi was a member of the BSC from 2012 to 2013.

48.     Defendant Michael Carreon is a Vice President and Corporate Controller at American Airlines. Mr. Carreon was a member of the EBC from 2014 to at least 2015.

*American Beacon*

49.     American Beacon is the manager of the American Beacon funds, including those offered by the Plan. American Beacon is also an "investment manager" of the Plan as defined by ERISA § 3(38), 29 U.S.C. § 1002(38). In that role, American Beacon is responsible for selecting the investment options to be included in the Plan and monitoring those investments to ensure that they remain prudent. As such, American Beacon is a named fiduciary of the Plan pursuant to 29 U.S.C. § 1002(38) and a functional fiduciary pursuant to 29 U.S.C. 1002(21)(A). American Beacon is headquartered in Irving, Texas.

50.     Each Defendant identified above as a Plan fiduciary is also subject to co-fiduciary

14

liability under 29 U.S.C. § 1105(a)(1)–(3) because it enabled other fiduciaries to commit breaches of fiduciary duties, failed to comply with 29 U.S.C. § 1104(a)(1) in the administration of its duties, and/or failed to make reasonable efforts to remedy other fiduciaries' breaches of their duties, despite having knowledge of those breaches.

51.     American Airlines, and the PAAC, BSC, PAAC, and EBC, all possessed the authority pursuant to the operative Plan document to delegate their responsibilities to any other person, persons, or entity.  Any individual or entity to whom these Defendants delegated any of their fiduciary functions or responsibilities are also fiduciaries of the Plan under 29 U.S.C. §§ 1002(21)(A) and 1105(c)(2).

## ERISA FIDUCIARY DUTIES AND PROHIBITED TRANSACTIONS

52.     ERISA imposes strict fiduciary duties of loyalty and prudence upon Defendants. 29 U.S.C. § 1104(a)(1) states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>
> (A)     For the exclusive purpose of
>
> (i)     Providing benefits to participants and their beneficiaries; and
>
> (ii)     Defraying reasonable expenses of administering the plan;
>
> (B)     With the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

53.     "The fiduciary obligations of the [plan's fiduciaries] to the participants and beneficiaries of an ERISA plan are those of trustees of an express trust—the highest known to the law." *LaScala v. Scrufari*, 479 F.3d 213, 219 (2d Cir. 2007) (quoting *Bierwirth*, 680 F.2d at 272 n.8).  They require strict attention and complete satisfaction.

### DUTY OF LOYALTY

15

54.     The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants.  *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000).  "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display . . . complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons."  *Id.* at 224 (quotation marks and citations omitted).  Thus, "in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider *only* factors relating to the interests of plan participants and beneficiaries . . . . A decision to make an investment may not be influenced by [other] factors unless the investment, when judged *solely* on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan."  Dep't of Labor ERISA Adv. Op. 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988) (emphasis added); *accord In re Worldcom, Inc.*, 263 F. Supp. 2d 745, 758 (S.D.N.Y. 2003) ("An ERISA fiduciary must 'conduct a careful and impartial investigation' of the merits and appropriate structure of a plan investment.") (quoting *Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 86 (2d Cir. 2001)).  Corporate officers must "avoid placing themselves in a position where their acts [or interests] as officers or directors of the corporation will prevent their functioning with the complete loyalty to participants demanded of them as trustees of the pension plan."  *Bierwirth*, 680 F.2d at 271.

### DUTY OF PRUDENCE

55.     ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets."  *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).  In addition to a duty to select prudent investments, under ERISA a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's]

16

duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015). If an investment is imprudent, the plan fiduciary "must dispose of it within a reasonable time." *Id.* (quotation omitted). Therefore, "a fiduciary cannot free himself from his duty to act as a prudent man simply by arguing that other funds . . . could theoretically, in combination, create a prudent portfolio." *In re Amer. Int'l Grp., Inc. ERISA Litigation II*, 2011 WL 1226459, at *4 (S.D.N.Y. Mar. 31, 2011) (quoting *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 n.3, 423-24 (4th Cir. 2007)).

56.    Failing to closely monitor and minimize administrative expenses (by, for example, failing to survey the competitive landscape and failing to leverage the plan's size to reduce fees), constitutes a breach of fiduciary duty. *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014). Similarly, selecting and retaining higher-cost investments because they benefit a party in interest constitutes a breach of fiduciary duties when similar or identical lower-cost investments are available. *See Braden v. Wal-Mart Stores*, 588 F.3d 585, 596 (8th Cir. 2009); *Tibble v. Edison Int'l*, 729 F.3d 1110, 1137–39 (9th Cir. 2013), *rev'd on other grounds*, 135 S. Ct. 1823 (2015).

### SOURCE AND CONSTRUCTION OF DUTIES

57.    The Supreme Court has noted that the legal construction of an ERISA fiduciary's duties is "derived from the common law of trusts." *Tibble*, 135 S. Ct. at 1828. Therefore "[i]n determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts." *Id.; accord La Scala v. Scrufari*, 479 F.3d 213, 219 (2d Cir. 2007) (explaining that the duty of prudence "is measured according to the objective prudent person standard developed in the common law of trusts"). In fact, the duty of prudence imposed under 29 U.S.C. §

1104(a)(1)(B) is a codification of the common law prudent investor rule found in trust law. *Buccino v. Cont'l Assur. Co.*, 578 F. Supp. 1518, 1521 (S.D.N.Y. 1983).

58.     Pursuant to the prudent investor rule, fiduciaries are required to "incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship."  Restatement (Third) of Trusts § 90(c)(3) (2007); *see also* Restatement § 90 cmt. b ("[C]ost-conscious management is fundamental to prudence in the investment function.").  The Introductory Note to the Restatement's chapter on trust investment further clarifies:

> [T]he duty to avoid unwarranted costs is given increased emphasis in the prudent investor rule.  This is done to reflect the importance of market efficiency concepts and differences in the degrees of efficiency and inefficiency in various markets. In addition, **this emphasis reflects the availability and continuing emergence of modern investment products**, not only with significantly varied characteristics but also **with similar products being offered with significantly differing costs**.  The duty to be cost conscious requires attention to such matters as the cumulation of fiduciary commissions with agent fees or the purchase and management charges associated with mutual funds and other pooled investment vehicles.   In addition, active management strategies involve investigation expenses and other transaction costs . . . that must be considered, realistically, in relation to the likelihood of increased return from such strategies.

Restatement (Third) of Trusts ch. 17, intro. note (2007) (emphasis added).

59.     Where markets are efficient, fiduciaries are encouraged to use low-cost index funds.  *Id.* § 90 cmt. h(1).  While a fiduciary may consider higher-cost, actively-managed mutual funds as an alternative to index funds, "[a]ctive strategies . . . entail investigation and analysis expenses and tend to increase general transaction costs . . . .  [T]hese added costs . . . must be justified by realistically evaluated return expectations."  *Id.* § 90 cmt. h(2).

### CO-FIDUCIARY LIABILITY

60.     ERISA also imposes explicit co-fiduciary duties on plan fiduciaries.  29 U.S.C. § 1105(a) states, in pertinent part, that:

In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

       (1) If he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or

       (2) if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

       (3) If he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

### PRUDENT MANAGEMENT OF AN EMPLOYEE RETIREMENT PLAN

61.    In a defined-contribution plan, fiduciaries are obligated to assemble a diversified menu of designated investment alternatives. 29 U.S.C. § 1104(a)(1)(C); 29 C.F.R. § 2550.404c-1(b)(1)(ii). A "designated investment alternative" is defined as "any investment alternative designated by the plan into which participants and beneficiaries may direct the investment of assets held in, or contributed to, their individual accounts." 29 C.F.R. § 2550.404a-5(h)(4).

62.    Each investment option within a defined-contribution plan is generally a pooled investment product—which includes mutual funds, collective investment trusts, and separate accounts. ICI Study at 7. For example, prior to the fall of 2015, the Plan's designated investment alternatives were comprised almost exclusively of mutual funds. These pooled investment products generally offer investors exposure to a particular asset class or sub-asset class. Ian Ayres & Quinn Curtis, *Beyond Diversification: The Pervasive Problem of Excessive Fees and "Dominated Funds" in 401(k) Plans*, 124 Yale L.J. 1476, 1485 (2015) (hereinafter "*Beyond Diversification*").

63.    The broad asset classes generally include fixed investments, bonds, stocks, and occasionally real estate. Money market funds, guaranteed investment contracts, and stable value funds are examples of fixed investments. Bonds are debt securities, which are generally

categorized by the issuer/borrower (U.S. Government, foreign governments, municipalities, corporations), the duration of the debt (repayable anywhere between 1 day and 30 years), and the default risk associated with the particular borrower.  Equity, or stock, investments, obtain ownership shares of companies in anticipation of income from corporate dividends or appreciation in the value of the company.  Equity investments are generally defined by three characteristics: (1) where the investment managers invest geographically (i.e., whether they invest in domestic or international companies, or both); (2) the size of companies they invest in (generally categorized as small cap, mid cap, or large cap); and (3) their investment style, i.e. growth, value, or blend (growth funds invest in fast-growing companies, value funds look for more conservative or established stocks that are more likely to be undervalued, and blend funds invest in a mix of growth stocks, value stocks, and companies in between).  Balanced funds are a type of mutual fund that invests in a mix of stocks and bonds.  Target-date funds assemble a broad portfolio of investments from different asset classes at a risk level that declines over time as the targeted retirement date approaches.

64.     Every pooled investment product charges certain fees and expenses that are paid by deductions from the pool of assets in transactions that typically occur on a monthly or quarterly basis.

65.     Investment funds can be either passively or actively managed.  Passive funds, popularly known as "index funds," seek to replicate the performance of a market index, such as the S&P 500, by purchasing a portfolio of securities matching the composition of the index itself. James Kwak, *Improving Retirement Savings Options for Employees*, 15 U. Pa. J. Bus. L. 483, 493 (2013).  By following this strategy, index funds produce returns that are very close to the market segment tracked by the index.  *Id.*  Index funds therefore offer predictability, diversified

exposure to a particular asset or sub-asset class, and low expenses. *Id.* Actively managed funds, on the other hand, pick individual stocks and bonds within a particular asset or sub-asset class and try to beat the market through superior investment selection. *Id.* at 485–86. Actively managed funds are typically much more expensive than index funds, but offer the potential to outperform the market (although this potential typically is not realized). U.S. Dep't of Labor, *Understanding Retirement Plan Fees and Expenses*, at 9 (Dec. 2011), *available at* http://www.dol.gov/ebsa/pdf/undrstndgrtrmnt.pdf.

66.    In addition to a menu of designated investment alternatives, many plans (including the Plan) provide employees the option of opening a self-directed brokerage account ("SDBA"), giving them access to a broad array of stocks, bonds, and mutual funds. Ayres & Curtis, *Beyond Diversification* at 1524. However, SDBAs have significant drawbacks. Participants that choose to utilize an SDBA typically are assessed an account fee and a fee for each trade. These fees are not charged when investing in designated investment alternatives available within the Plan.[1]    Costs are also higher because persons who invest in mutual funds within an SDBA typically must invest in retail mutual funds, rather than lower-cost institutional shares that are only available to retirement plans because of their ability to leverage the negotiating power of the plan's assets. DOL Field Assistance Bulletin 2012-02R (July 30, 2012), *available at* http://www.dol.gov/ebsa/regs/fab2012-2R.html; Christopher Carosa, CTFA, *Is the Fiduciary Liability of Self-Directed Brokerage Options Too Great for 401k Plan Sponsors?*, FIDUCIARY NEWS (June 11, 2013), *available at* http://fiduciarynews.com/2013/06/is-

---

[1] Investments available within a self-directed brokerage account are excluded from the definition of "designated investment alternative". 29 C.F.R. § 2550.404a-5(h)(4). Therefore, fiduciaries are under no obligation to disclose performance, benchmark, or fee information regarding the investments available within an SDBA. *Id.* § 2550.404a-5(d).

the-fiduciary-liability-of-self-directed-brokerage-options-too-great-for-401k-plan-sponsors/.

Furthermore, SDBA investors often invest in imprudent investments, because there is no fiduciary responsible for selecting or monitoring the investments within an SDBA.  29 C.F.R. § 2550.404a-5(f), (h)(4).

67.     The existence of an SDBA option does not excuse plan fiduciaries from constructing and maintaining a prudent and appropriate menu of designated investment alternatives.   29 C.F.R. § 2550.404c-1(d)(1)(iv) (a participant's "independent control" over assets "does not serve to relieve a fiduciary from its duty to prudently select and monitor any ... designated investment alternative offered under the plan").  For the reasons described above (among others), investors in SDBAs typically experience "low real rates of return and higher retirement failure rates."  Marijoyce Ryan, CPP, *Money Management: The Downside of Self-Directed Brokerage Accounts*, THE DAILY RECORD (June 26, 2012), *available at* http://nydailyrecord.com/blog/2012/06/26/money-management-the-downside-of-self-directed-brokerage-accounts/; *see also* Dr. Gregory Kasten, Self-Directed Brokerage Accounts Reduce Success (2004), at 1, 13–14, *available at* http://etf.wi.gov/boards/agenda_items_2004/dc20040819item4.pdf (discussing results of study showing that SDBAs lag the performance of a model portfolio of the plan's designated investment alternatives by an average of 4.70% per year).

68.     In addition, SDBAs are quite difficult to set up, requiring Plan participants to complete additional paperwork while also requiring a greater investment of time to choose among the hundreds or thousands of investment options.   Due to their high costs and administrative complexity, SDBAs are seldom used by participants: only 2% of retirement plan assets are held in SDBAs.  Investment Company Institute & Deloitte Consulting LLP, Inside the

Structure of Defined Contribution/401(k) Plan Fees, 2013, at 15 (Aug. 2014), *available at* https://www.ici.org/pdf/rpt_14_dc_401k_fee_study.pdf (hereinafter "ICI/Deloitte Study"). Consistent with this empirical study, less than 2% of the Plan's assets were held in SDBAs as of the end of 2014.

MINIMIZATION OF PLAN EXPENSES

69.      At retirement, employees' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 135 S. Ct. at 1826.   Accordingly, poor investment performance and excessive fees can significantly impair the value of a participant's account. According to one study, the average working household with a defined contribution plan will lose $154,794 to fees and lost returns over a 40-year career. *See* http://money.cnn.com/2013/03/27/retirement/401k-fees/.  Put another way, excess fees can force a worker to work an extra five to six years to make up for the excess fees that were paid. *Id.* Over time, even seemingly small differences in fees and performance can result in vast differences in the amount of savings available at retirement. *See, e.g.*, Stacy Schaus, *Defined Contribution Plan Sponsors Ask Retirees, "Why Don't You Stay?" Seven Questions for Plan Sponsors*, PIMCO (Nov. 2013), https://www.pimco.com/insights/investment-strategies/featured-solutions/defined-contribution-plan-sponsors-ask-retireeswhy-dont-you-stay-seven-questions-for-plan-sponsors (explaining that "a reduction in [annual] fees from 100 bps[2] to 50 bps [within a retirement plan] could extend by **several years** the potential of participants' 401(k)s to provide

---

[2] The term "bps" is an abbreviation of the phrase "basis points."  One basis point is equal to .01%, or 1/100th of a percent.  Thus, a fee level of 100 basis points translates into fees of 1% of the amount invested.     *See* Investopedia, Definition of 'Basis Point (BPS)', http://www.investopedia.com/terms/b/basispoint.asp (last visited Nov. 11, 2015).

23

retirement income") (emphasis added); U.S. Dep't of Labor, *A Look at 401(k) Plan Fees* 1–2 (Aug. 2013), *available at* http://www.dol.gov/ebsa/pdf/401kFeesEmployee.pdf (illustrating impact of expenses with example in which 1% difference in fees and expenses over 35 years reduces participant's account balance at retirement by 28%).

70.     There are two major categories of expenses within a defined contribution plan: administrative expenses and investment management expenses.  ICI/Deloitte Study at 17.  The administrative and investment functions within a defined-contribution plan are separated within a defined contribution plan.  Administrative services are performed by the plan's service providers such as the recordkeeper, trustee, auditors, attorneys, or consultants.  Recordkeeping is generally the largest administrative expense.  Because of this separation of services, the investments within a defined-contribution plan are not responsible for performing any administrative services such as recordkeeping, investor education, or customer service.  The only service performed by the plan's investment products is managing the plan's investments.  Administrative expenses can be either paid by the plan sponsor or by the plan.  Investment management expenses are the fees charged by the investment manager, and participants "typically pay these asset-based fees as an expense of the investment options in which they invest." *Id.*  On average, 82% of overall fees within a plan are investment expenses, while administrative fees on average make up only 18% of total fees. *Id.*

71.     Fiduciaries exercising control over administration of the plan and the selection of designated investment alternatives can minimize plan expenses by hiring low-cost service providers and by selecting a menu of low-cost investment options.   This task is made significantly easier the larger a plan gets.  Economies of scale generally result in lower administrative expenses on a per-participant or percentage-of-assets basis.  ICI/Deloitte Study at

7, 21.  Larger plans also can lower investment management fees by selecting mutual funds only available to institutional investors or by negotiating directly with the investment manager to obtain a lower fee than is offered to mutual fund investors.  *See* Consumer Reports, *How to Grow Your Savings: Stop 401(k) Fees from Cheating You Out of Retirement Money* (Aug. 2013), *available at* http://www.consumerreports.org/cro/magazine/2013/09/how-to-grow-your-savings/index.htm (instructing employees of large corporations that "[y]our employer should be able to use its size to negotiate significant discounts with mutual-fund companies"); U.S. Dep't of Labor, *Study of 401(k) Plan Fees and Expenses*, at 17 (April 13, 1998), *available at* https://www.dol.gov/ebsa/pdf/401kRept.pdf (reporting that by using separate accounts and similar instruments, "[t]otal investment management expenses can commonly be reduced to one-fourth of the expenses incurred through retail mutual funds").  Empirical evidence bears this out.  In 2012, total plan fees in the average defined contribution plan were 0.91%, but this varied between an average of 1.27% in plans with $1 million to $10 million in assets, and an average of only 0.33% for plans with over $1 billion in assets.  ICI Study at 41.

72.  Given the significant variation in total plan costs attributable to plan size, the reasonableness of administrative expenses and investment management expenses should be determined by comparisons to other similarly-sized plans.  *See* 29 U.S.C. § 1104(a)(1)(B) (requiring ERISA fiduciaries to discharge their duties in the manner "that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character") (emphasis added); *Tibble v. Edison Int'l*, 2010 WL 2757153, at *9, 15, 28 (C.D. Cal. July 8, 2010) (evaluating the propriety of particular fees and investment decisions in light of the size of the plan), *rev'd on other grounds*, 135 S. Ct. 1823 (2015); *Tussey v. ABB, Inc.*, 2007 WL 4289694, at *6, n.5 (W.D. Mo. Dec. 3, 2007) (determining that administrative and

investment expenses were unreasonable through comparisons to similar plans because "[a]t most, reasonable compensation should mean compensation commensurate with that paid by similar plans for similar services to unaffiliated third parties") (quoting Nell Hennessy, *Follow the Money: ERISA Plan Investments in Mutual Funds and Insurance*, 38 J. Marshall L. Rev. 867, 877 (2005)).

## SELECTION OF APPROPRIATE INVESTMENT OPTIONS FOR THE PLAN

73.     With respect to designing the menu of investment options, a substantial body of academic and financial industry literature provides two critical insights for fiduciaries to consider when selecting investments to be offered within a plan.

74.     The first critical insight is that fiduciaries must carefully tend to their duty of investment menu construction—selecting prudent investments, regularly reviewing plan options to ensure that investment choices remain prudent, and weeding out costly or poorly-performing investments. Plan participants often engage in "naive diversification," whereby they attempt to diversify their holdings simply by spreading their money evenly among the available funds. Jill E. Fisch & Tess Wilkinson-Ryan, *Why Do Retail Investors Make Costly Mistakes?*, 162 U. Pa. L. Rev. 605, 636–38 (2014) (hereinafter "*Costly Mistakes*"); Shlomo Benartzi & Richard H. Thaler, *Naive Diversification Strategies in Defined Constribution Plans*, 91 Am. Econ. Rev. 79, 96 (2001). Additionally, once an initial investment allocation has been chosen, 401(k) participants are prone to inertia, failing to reassess their investment decisions even when presented with evidence suggesting that they should. John Ameriks & Stephen P. Zeldes, *How Do Household Portfolio Shares Vary with Age?*, at 31, 48, Columbia University Working Paper (Sept. 2004) (finding that among group of 16,000 randomly selected TIAA-CREF participants, in a ten-year period, 48 percent of participants made no changes at all to their account and 73 percent of

participants made no change to the allocation of existing assets); Julie Agnew *et al.*, *Portfolio Choice and Trading in a Large 401(k) Plan*, 93 Amer. Econ. Rev. 193, 194 (Mar. 2003) (sampling of seven thousand 401(k) accounts showed that 87 percent of 401(k) account holders made no trades in the average year and that the average 401(k) investor makes one trade every 3.85 years). For all of these reasons, prudent fiduciaries will limit their investment menus to only those funds that represent sound long-term investments, and remove imprudent investments rather than trusting participants to move their money out of an imprudent investment.

75. The second critical insight provided by academic and financial industry literature is that in evaluating the prudence of investments, keeping fees low is a critical consideration. Numerous scholars have demonstrated that high expenses are not correlated with superior investment management. Indeed, funds with high fees on average perform worse than less expensive funds, even on a pre-fee basis. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. Econ. Behav. & Org. 871, 873 (2009) (hereinafter "*When Cheaper is Better*"); *see also* Fisch & Wilkinson-Ryan, *Costly Mistakes*, at 1993.

> [T]he empirical evidence implies that superior management is not priced through higher expense ratios. On the contrary, it appears that the effect of expenses on after-expense performance (even after controlling for funds' observable characteristics) is more than one-to-one, which would imply that low-quality funds charge higher fees. Price and quality thus seem to be inversely related in the market for actively managed funds.

Gil-Bazo & Ruiz-Verdu, *When Cheaper is Better*, at 883.

76. While high-cost mutual funds may exhibit positive, market-beating performance over shorter periods of time, studies demonstrate that this is arbitrary: outperformance during a particular period of time is not predictive of whether a mutual fund will perform well in the future. Laurent Barras *et al.*, *False Discoveries in Mutual Fund Performance: Measuring Luck*

*in Estimated Alphas*, 65 J. Fin. 179, 181 (2010); Mark M. Carhart, *On Persistence in Mutual Fund Performance*, 52 J. Fin. 57, 57, 59 (1997).  The one notable exception to the general unpredictability of mutual fund returns is that the worst-performing mutual funds show a strong, persistent tendency to continue their poor performance.  Carhart, *On Persistence in Mutual Fund Performance*, at 57.  Therefore, regardless of where one comes down on the issue of active versus passive investing, a prudent investor should choose only index funds and low-cost actively managed funds whose long-term performance history permits a fiduciary to realistically conclude that the fund is likely to outperform its benchmark index in the future, after accounting for investment expenses.  *See* Restatement (Third) of Trusts § 90 cmt. h(2).

## DEFENDANTS' VIOLATIONS OF ERISA IN MANAGING THE PLAN

### I.     BACKGROUND OF THE PLAN AND AMERICAN BEACON FUNDS

77.     As of the end of 2014, defined contribution plans in the United States held $6.8 trillion in assets. Investment Company Institute, *2015 Investment Company Fact Book* (2015), *available at* http://www.icifactbook.org/fb_ch7.html.  This has created a large marketplace for retirement plan services that is well-established and highly competitive.  Multi-billion dollar plans such as the Plan wield tremendous bargaining power and can obtain high-quality investment management and administrative services at very low costs.

78.     In 1986, American Airlines' then parent company, AMR, started a line of mutual funds named the American AAdvantage Funds.  The mutual funds were renamed the American Beacon Funds in 2005, and the investment company was renamed American Beacon Advisors, Inc.  American Beacon was a wholly-owned subsidiary of American Airlines, which itself was a wholly owned subsidiary of AMR.  In 2008, AMR sold American Beacon for $480 million to Lighthouse Holdings, Inc.

79.     In agreements of this nature, where the seller of an asset management company maintains discretionary control over a significant percentage of the assets being purchased, it is common for the contract to contain a provision whereby the seller agrees to keep the assets under its control invested with the entity being sold for a period of time, or impose penalties on the seller for withdrawing the assets within a certain time period.   Though the terms of the agreement with Lighthouse Holdings, Inc. were not made public, discovery will show that under the terms of AMR's sale of American Beacon, AMR agreed to certain limitations upon its ability to move the Plan's investments out of American Beacon funds.

80.     In the following press release, American Airlines effectively admitted that the buy-sell agreement with Lighthouse Holdings, Inc. contained a provision under which the American Beacon funds would remain in the Plan:

> AMR Corporation, the parent company of American Airlines, Inc., announced today that it has completed the sale of American Beacon Advisors, Inc., its wholly owned asset-management subsidiary, to Lighthouse Holdings, Inc. . . . . **American Beacon will continue to provide a number of services for AMR and its affiliates**, **including** cash management for AMR and investment advisory services and **investment management services for American Airlines** pension, **401(k)** and other health and welfare plans.   An independent third party reviewed and approved the <u>**continuing relationships**</u> **between American Beacon and American Airlines** pension, **401(k)** and other health and welfare plans to satisfy the fiduciary duties and other rules that apply to these plans.

American Airlines Press Release, Sept. 15, 2008, *available at* http://hub.aa.com/ en/nr/pressrelease/amr-corporation-completes-sale-of-american-beacon-advisors-inc-to-lighthouse-holdings-inc-an-affiliate-of-pharos-capital-group-llc-and-tpg-capital-lp.

81.     Also as part of the agreement, AMR Corp. "acquire[d] a small equity stake in the parent company of Lighthouse Holdings." *Id.*  An earlier press release stated that AMR retained a "10 percent ownership interest" in American Beacon.   American Airlines Press Release, Apr. 16, 2008, *available at* http://hub.aa.com/en/nr/pressrelease/amr-corporation-announces-

agreement-to-sell-american-beacon-advisors-inc-to-lighthouse-holdings-inc-an-affiliate-of-pharos-capital-group-llc-and-tpg-capital.

82.     As another indication of the continued relationships codified within the agreement, the managing partner of one of the two private equity groups financing the deal stated he was looking forward to working with AMR not only as a minority owner of American Beacon, but also as "a significant client." *Id*.[3]

83.     As described more fully in Section II below, after the sale to Lighthouse Holdings, Inc. and throughout the time period that is the subject of this Complaint, American Beacon served as the Plan's investment manager, providing advice to the Plan's other fiduciaries about the Plan's investment options, and making recommendations about which investments to retain and which to remove, and in the event of removal, which fund to use as a replacement. In this role, American Beacon steered the Plan into its own funds in furtherance of its own self-interest and at the expense of Plan participants.

84.     As of the end of 2010, the Plan had approximately $6.5 billion in assets, and offered participants 29 designated investment alternatives, as well as an SDBA option. The

---

[3] AMR Corp. claimed in a press release that it hired a purported "independent third party" to review the terms of the American Beacon sale agreement. American Airlines Press Release, Apr. 16, 2008, *available at* http://hub.aa.com/en/nr/pressrelease/amr-corporation-announces-agreement-to-sell-american-beacon-advisors-inc-to-lighthouse-holdings-inc-an-affiliate-of-pharos-capital-group-llc-and-tpg-capital. However, this was simply a whitewash to make the agreement appear compliant with ERISA. *See Bierwirth*, 680 F.2d at 272 (explaining that "expert advice is not a whitewash" by which a party can satisfy its fiduciary duties). The third party did not render a truly independent opinion, and was hired with an implicit understanding that its role was to make the agreement look legitimate and to ultimately approve the deal. The third party hired to review the American Beacon sale was not acting in a fiduciary capacity when reviewing the deal. It was not advising the Plan or the Plan's fiduciaries, but was instead was advising AMR, who was not a Plan fiduciary and was not the Plan's sponsor. Furthermore, once the deal was approved in September 2008, the third party was not hired to conduct any ongoing reviews of the Plan or the Plan's relationships with American Beacon, to ensure that the Plan's investments remained compliant with ERISA.

designated investment alternatives include 26 mutual funds, a bank deposit option through American Airlines Federal Credit Union, a collective trust money market account, and AMR stock. Fourteen of the 26 mutual funds in the Plan were American Beacon Funds at the time.

85.     By the end of 2014, the Plan had approximately $9.1 billion in assets, and offered participants 30 designated investment alternatives, as well as an SDBA option. The designated investment alternatives included American Airlines Group, Inc. stock (the successor parent corporation of AMR), a deposit account from American Airlines Federal Credit Union, and 28 mutual funds. Thirteen of the 28 mutual funds offered by the Plan were American Beacon funds.[4]

86.     In November 2014, it was announced that Lighthouse Holdings, Inc. had reached an agreement to sell American Beacon Funds for $600 million. Korri Kezar, *TPG Capital Sells American Beacon Advisors in $600M Deal*, DALLAS BUSINESS JOURNAL, Nov. 25, 2014, *available at* http://www.bizjournals.com/dallas/news/2014/11/25/tpg-capital-sells-american-beacon-advisors-in-600m.html. The deal was scheduled to be completed in the second quarter of 2015.

87.     After the close of the deal, American Airlines and its parent company no longer had a financial incentive to retain American Beacon Funds within the Plan: any ownership stake in Lighthouse Holdings, Inc. would have been sold, and any contractual obligations to keep the American Beacon Funds in the Plan would have been terminated by the subsequent sale.

---

[4] The only American Beacon fund present in the Plan in 2010 that was no longer in the Plan as of 2014 was the American Beacon Large Cap Growth Fund, which was removed from the Plan in 2012 as a result of the fund's closure effective May 15, 2012, as announced in a prospectus supplement on March 1, 2012. American Beacon Large Cap Growth Fund, Prospectus Supplement, Mar. 1, 2012, *available at* https://www.sec.gov/Archives/edgar/data/809593/000080959312000016/lcgtermination.htm.

88.     In September 2015, mere months after the close of the American Beacon sale, the Plan was overhauled, and all American Beacon mutual funds were removed from the Plan.  After the overhaul, the Plan's designated investment alternatives consisted almost entirely of collective investment trusts.  American Beacon played a role in managing three of these trusts, managing 100% of the large company value option, 40% of the international equity option, and 20% of the small/mid cap equity option.  In effect, though, American Beacon had been removed as the manager of ten of the thirteen investment strategies that were in the Plan before the overhaul, and had its managerial role reduced in two of the three investment strategies in which it remained involved post-overhaul.

89.     The Plan's removal of the American Beacon funds had an immediate and drastic effect on American Beacon's mutual fund business.  In August 2015, American Beacon announced that "due to large redemptions which are expected to occur by the end of 2015 that will substantially reduce the Fund's asset size," it would be closing seven mutual funds that had been in the old version of the Plan. American Beacon Funds, Prospectus Supplement, Aug. 20, 2015, *available at* https://www.sec.gov/Archives/edgar/data/809593/000080959315000053/liquidation082015.htm.  On January 12, 2016, an additional American Beacon fund that had been in the Plan was liquidated "due to [the] fund's small asset size."  American Beacon Funds, Prospectus Supplement, Jan. 12, 2016, *available at* https://www.sec.gov/Archives/edgar/data/809593/000080959316000091/jan12tipsriafundtermination.htm.   In other words, eight of the thirteen American Beacon funds that were held by the Plan prior to the Plan's overhaul in the fall of 2015 were complete failures in the marketplace, had only been able to

continue operations due to the Plan's investment in those funds, and thus were forced to close when they were removed from the Plan.[5]

## II.   AS INVESTMENT MANAGER FOR THE PLAN, AMERICAN BEACON PUT ITS OWN INTERESTS AHEAD OF PLAN PARTICIPANTS'

90.     Since at least 2010, American Beacon has served as the investment manager of the Plan, as defined by ERISA § 3(38), 29 U.S.C. § 1002(38). As investment manager, American Beacon consistently placed its own interests ahead of those of Plan participants.

91.     As an example of American Beacon's self-interested advice, the Plan has typically offered at least one American Beacon fund in every asset class of funds offered through the Plan, and no more than one non-American Beacon fund. The habitual, practically automatic inclusion and retention of American Beacon funds demonstrates that the process for managing the Plan's investment options was not impartial, but instead was biased in favor of the economic interests of American Airlines and American Beacon.

92.     As another example of American Beacon's self-interested advice, the Plan has offered participants the ability to select from among three pre-mixed investment portfolios—a Conservative, Moderate, or Aggressive portfolio option. In fact, the Moderate option is the default investment option for participants who do not make an election as to where their contributions are to be directed. By investing in one of these portfolios, a participant is in fact investing in a pre-determined mix of investments already available to Plan participants. As the Plan's investment manager, American Beacon was responsible for designing and monitoring

---

[5] The eight American Beacon funds that closed in 2015 after being removed from the Plan were the American Beacon S&P 500 Index Fund, the American Beacon Small Cap Index Fund, the American Beacon International Equity Index Fund, the American Beacon Emerging Markets Fund, the American Beacon High Yield Bond Fund, the American Beacon Intermediate Bond Fund, the American Beacon Short-Term Bond Fund, and the American Beacon Treasury Inflation Protected Securities Fund.

each portfolio. American Beacon populated each of these portfolios almost exclusively with American Beacon funds, without considering non-American Beacon options if there was an American Beacon option to choose from.  American Beacon did not employ an impartial process to in designing or monitoring the prudence of these pre-mixed portfolios; instead American Beacon used its own mutual funds by default.

93.     As a practical matter, American Beacon did not employ an impartial process for reviewing the Plan's investments. American Beacon prioritized the inclusion and retention of American Beacon funds in the Plan, without investigating whether the Plan would benefit from non-American Beacon alternatives.  This benefited American Beacon in three ways. First, American Beacon profited from the investment management fees paid for its funds. Second, the Plan's holdings of American Beacon funds made the funds appear more competitive in the marketplace than they actually were. Third, American Beacon was able to achieve economies of scale using the Plan's assets, thus allowing it to lower the expense ratios for its funds so as to attract other customers. The closing of eight American Beacon mutual funds after the Plan removed them demonstrates how vitally important the Plan's use of American Beacon Funds was for the viability of its mutual fund business.

## III.   DEFENDANTS FAILED TO PROMPTLY REMOVE IMPRUDENT INDEX FUNDS

94.     Three of the American Beacon funds held by the Plan as of the end of 2010 were index funds: the American Beacon S&P 500 Index Fund, the American Beacon Small Cap Index Fund, and the American Beacon International Equity Index Fund.

95.     An index fund is a passive investment which attempts to mimic the performance of a market index rather than making subjective determinations about the merits of particular stocks or bonds.  A prudent investor seeking to invest in a fund that mimics a particular index or

market will therefore generally select whichever fund tracks that particular market or index at the lowest cost. *See* Gail Marks-Jarvis, *Step-by-Step Guidance on Shopping for Index Funds*, CHICAGO TRIBUNE (Aug. 16, 2015), *available at* http://www.chicagotribune.com/ business/yourmoney/ct-marksjarvis-0816-biz-20150814-column.html; Jim Mitchell, *Investors Should Choose Index Funds with the Lowest Fees*, TheStreet (Mar. 10, 2015), http://www.thestreet.com/story/13072023/3/investors-should-choose-index-funds-with-the-lowest-fees.html.

### *American Beacon S&P 500 Index Fund*

96.     The American Beacon S&P 500 Index Fund attempts to mimic the performance of the Standard & Poor's 500 Index, known as the S&P 500. In 2010, institutional shares of the American Beacon S&P 500 Index Fund had an expense ratio of 0.15%, meaning that investors in the fund paid fees of 0.15% per year to invest in the fund. Based on this expense ratio and the Plan's investment in this fund as of the end of 2009, the Plan could reasonably surmise that in participants would pay approximately $470,500 in expenses in 2010, plus whatever additional fees were assessed based on additional investments in the fund and increases in the fund's value.

97.     A minimal investigation conducted in 2010 would have revealed that the Plan could have instead invested in Institutional Plus shares of the Vanguard Institutional Index Fund, which also seeks to mimic the performance of the S&P 500, and had an expense ratio of only 0.02% in 2010. Had the Plan invested in the Vanguard Institutional Index Fund instead of the American Beacon S&P 500 Index Fund, Plan participants would have paid only $62,750 in fees in 2010. The Plan did not make this change, however, and therefore **Plan participants paid more than seven times more in fees** than they would have paid if Defendants had prudently

removed the American Beacon S&P 500 Index Fund from the Plan and invested instead in Institutional Plus shares of the Vanguard Institutional Index Fund.

98.     Retention of the American Beacon S&P 500 Index Fund remained imprudent each passing year.  While the Vanguard Institutional Index Fund's expenses remained 0.02%, the expense ratio of the American Beacon S&P 500 Index Fund was 0.15% in 2010, to 0.13% in 2011, 0.13% in 2012, 0.16% in 2013, 0.15% in 2014, and 0.14% in 2015.  The Plan's investment in the fund also increased over time.  The Plan's balance in the American Beacon S&P 500 Index Fund was $312 million as of the end of 2009; $378 million as of the end of 2010; $402 million as of the end of 2011; $594 million as of the end of 2012; $902 million as of the end of 2013; and $1.23 billion as of the end of 2014.  Plan participants therefore paid at least $408,000 in excess fees in 2010; $416,000 in 2011; $442,000 in 2012; $832,000 in 2013; $1,173,000 in 2014, and $1,107,000 in 2015.[6]  In total, Plan participants have paid at least $4.38 million in excess fees over the past six years due to Defendants' failure to timely remove the imprudent American Beacon S&P 500 Index Fund.

99.     The performance of the American Beacon S&P 500 Index Fund and the Vanguard Institutional Index Fund from 2010 to 2014[7] was what one would expect (and what the academic literature would predict, *see supra* paragraphs 75 and 76) given the cost differential between the two funds—the Vanguard fund generally outperformed the American Beacon fund by an amount equal to or greater than the cost differential between the two funds.

---

[6] The excess fees for 2015 assume that the American Beacon index funds were removed effective October 1, 2015.  Exact calculation of damages will require further discovery.

[7] Full-year performance data for 2015 is not available because the American Beacon S&P 500 Index Fund discontinued its operations before the end of 2015.

**Annual Performance and Fees of American Beacon & Vanguard S&P 500 Index Funds**

| | 2010 | 2011 | 2012 | 2013 | 2014 | Avg. Return for 2010-14 |
|---|---|---|---|---|---|---|
| American Beacon S&P 500 Index (AASPX) | 14.96% (15 bps) | 1.92% (13 bps) | 15.87% (13 bps) | 32.15% (16 bps) | 13.54% (15 bps) | 15.29% |
| Vanguard Institutional Index (VIIIX) | 15.07% (2 bps) | 2.12% (2 bps) | 16.00% (2 bps) | 32.37% (2 bps) | 13.68% (2 bps) | 15.45% |
| S&P 500 Index | 15.06% | 2.11% | 16.00% | 32.39% | 13.69% | 15.45% |

100.    All factors other than the cost of each fund also supported removing the American Beacon S&P 500 Fund and replacing it with the Vanguard Institutional Index Fund. Vanguard had significantly more experience with indexing and a superior reputation. The Vanguard fund also had lower tracking error rates.

101.    The conduct of fiduciaries of other similarly-sized plans demonstrates the imprudence of Defendants' retention of the American Beacon S&P 500 Index Fund. As of the end of 2014, approximately 250 defined contribution plans with over $1 billion in assets held the Vanguard Institutional Index Fund.  In contrast, only two defined contribution plans with over $1 billion in assets held the American Beacon S&P 500 Index Fund, one of which was the Plan, and the other of which had less than one hundredth of one percent of the plan's assets in the American Beacon fund (in the plan's self-directed brokerage account).

### *American Beacon International Equity Index Fund*

102.    The Plan's retention of the American Beacon International Equity Index Fund was similarly imprudent.  The American Beacon International Equity Index Fund attempts to mimic the results of the MSCI EAFE Index, an index designed to measure the equity market performance of developed markets outside the US & Canada.  At the beginning of 2010, the Plan

had approximately $241 million invested in this fund.  This amount increased to $499 million by the end of 2014.  In 2010, institutional shares of the American Beacon International Equity Index Fund had an expense ratio of 0.23%.  A prudent review of available market alternatives would have revealed two alternatives with significantly lower expenses. First, Vanguard offered institutional shares of the Vanguard Developed Markets Index Fund, which also mimicked the MSCI EAFE Index at the time,[8] but had an expense ratio of .08%, roughly a third of the amount that the American Beacon International Equity Index Fund was charging. Second, Fidelity offered the Fidelity International Index Advantage Fund, which also mimics the MSCI EAFE Index, but had an expense ratio of only .07%, less than one-third the amount that the American Beacon International Equity Index Fund charged.  Year after year, the Vanguard and Fidelity options have remained at least three times cheaper than the equivalent American Beacon option. Defendants' failure to timely remove the imprudent American Beacon International Equity Index Fund has cost Plan participants over $3 million in excess fees over the past six years.

103.    The performance of the American Beacon International Equity Index Fund, the Vanguard Developed Markets Index Fund and the Fidelity International Index Advantage Fund from 2010 to 2014[9] was what one would expect (and what the academic literature would predict, *see supra* paragraphs 75 and 76) given the cost differential between the funds—the Vanguard

---

[8] In 2013 the Vanguard Developed Markets Index Fund switched its tracking index to the FTSE Developed ex North America Index to reduce costs while providing materially identical exposure to developed market equities.

[9] Full-year performance data for 2015 is not available because the American Beacon International Equity Index Fund discontinued its operations before the end of 2015.

and Fidelity funds generally outperformed the American Beacon fund by an amount equal to or greater than the cost differential between the funds.[10]

**Annual Performance & Fees of American Beacon, Fidelity & Vanguard Int'l Index Funds**

| | 2010 | 2011 | 2012 | 2013 | 2014 | Avg. Return for 2010-14 |
|---|---|---|---|---|---|---|
| Am. Beac. Int'l Equity Index Fund (AIIIX) | 7.56% (23 bps) | -12.50% (23 bps) | 18.71% (21 bps) | 21.55% (24 bps) | -6.13% (19 bps) | 4.98% |
| Vanguard Dev. Markets Index Fund (VTMNX) | 8.55% (8 bps) | -12.62% (8 bps) | 18.70% (8 bps) | 22.15% (8 bps) | -5.72% (8 bps) | 5.33% |
| Fidelity Int'l Index Advantage Fund (FSPSX) | 7.70% (7 bps) | -12.15% (7 bps) | 18.85% (6 bps) | 21.87% (6 bps) | -5.31% (6 bps) | 5.35% |
| MSCI EAFE Idx | 7.75% | -12.62% | 17.32% | 22.78% | -4.90% | 5.34% |

104.     All factors other than the cost of each fund also supported removing the American Beacon International Equity Index Fund and replacing it with either the Vanguard or Fidelity international index funds. Vanguard and Fidelity had significantly more experience and expertise with indexing strategies and a superior reputation. The Vanguard and Fidelity funds also had lower tracking error rates.

105.     The conduct of fiduciaries of other similarly-sized plans demonstrates the imprudence of Defendants' retention of the American Beacon International Equity Index Fund.

---

[10] International index funds perform a fair-value adjustment at the end of each calendar year to account for stale pricing of certain securities. The amount of this adjustment will vary from fund to fund due to differences in indexing strategies. Because there is no corresponding adjustment to the underlying index, funds may appear to have significantly underperformed or outperformed the index in a particular calendar year. However, deviations in a particular year are not especially informative because fair-value adjustments are typically corrected in the following year. Over time, these fair value adjustments typically net out, with no ultimate effect on the performance of the fund.

As of the end of 2014, approximately 65 defined contribution plans with over $1 billion in assets held the Fidelity International Index Fund, and 49 defined contribution plans with over $1 billion in assets held the Vanguard Developed Markets Index Fund (plus, an additional 154 plans held the Vanguard Total International Stock Index Fund, which tracks a different international equity index, but was also a viable option for the Plan). In contrast, only two defined contribution plans with over $1 billion in assets held the American Beacon International Equity Index Fund: one of these was the Plan, while the other held less than one-quarter of one percent of the plan's assets in the American Beacon fund.

### *American Beacon Small Cap Index Fund*

106.    The Plan's retention of the American Beacon Small Cap Index Fund was similarly imprudent. The American Beacon Small Cap Index Fund attempts to mimic the results of the Russell 2000 Index, an index designed to measure the equity market performance of small companies located in the United States. At the beginning of 2010, the Plan had approximately $38 million invested in this fund. This amount increased to $281 million by the end of 2013. In 2010, institutional shares of the American Beacon Small Cap Index Fund had an expense ratio of 0.23%. A prudent review of available market alternatives would have revealed two alternatives with significantly lower expenses. First, TIAA-CREF offered institutional shares of the TIAA-CREF Small-Cap Blend Fund, which also mimics the Russell 2000 Index, but had an expense ratio of .09%, less than half the amount that the American Beacon Small Cap Index Fund was charging. Second, Vanguard offered institutional shares of the Vanguard Small Cap Index Fund, which offered investors exposure to small company stocks (but mimicked a different index than the American Beacon fund), and had an expense ratio of only .08% (roughly one-third the amount that the American Beacon Small Cap Index Fund charged). Alternatively, if the Plan's

fiduciaries were insistent on a fund that mimicked the Russell 2000 Index, at the end of 2010 the Plan could have invested in the Vanguard Russell 2000 Index Fund, which also mimics the Russell 2000 Index, but had an expense ratio of only .08%, roughly one-third the amount the American Beacon option charged.  Year after year, the Vanguard and TIAA-CREF options at all times remained two to four times cheaper than the equivalent American Beacon option. Defendants' failure to timely remove the imprudent American Beacon International Equity Index Fund has cost Plan participants over $1.2 million in excess fees over the past six years.

107.    The performance of the American Beacon Small Cap Index Fund, the TIAA-CREF Small-Cap Blend Index Fund, the Vanguard Small Cap Index Fund, and the Vanguard Russell 2000 Index Fund from 2010 to 2014[11] was what one would expect (and what the academic literature would predict, *see supra* paragraphs 75 and 76) given the cost differential between the funds—the Vanguard and TIAA-CREF funds generally outperformed the American Beacon fund.

---

[11] Full-year performance data for 2015 is not available because the American Beacon Small Cap Index Fund discontinued its operations before the end of 2015 as a result of the Fund being removed from the Plan's lineup.

**Annual Performance & Fees of American Beacon, TIAA-CREF & Vanguard Small Cap Index Funds**

| | 2010 | 2011 | 2012 | 2013 | 2014 | Avg. Return for 2010-14 |
|---|---|---|---|---|---|---|
| Am. Beac. Small Cap Index (ASCIX) | 27.05% (23 bps) | -4.54% (23 bps) | 16.36% (18 bps) | 38.98% (26 bps) | 4.85% (21 bps) | 15.51% |
| TIAA-CREF Small Cap Blend Index (TISBX) | 26.78% (9 bps) | -4.12% (8 bps) | 16.61% (8 bps) | 38.98% (7 bps) | 5.15% (6 bps) | 15.68% |
| Vanguard Small Cap Index (VSCIX)[12] | 27.95% (8 bps) | -2.65% (8 bps) | 18.26% (8 bps) | 37.80% (8 bps) | 7.53% (8 bps) | 16.90% |
| Vanguard Russell 2000 Idx (VRTIX) | n/a | -4.20% (8 bps) | 16.34% (8 bps) | 38.94% (8 bps) | 5.00% (8 bps) | n/a[13] |
| Russell 2000 Index | 26.85% | -4.18% | 16.35% | 38.82% | 4.89% | 15.55% |

108.    All factors other than the cost of each fund also generally supported removing the American Beacon Small Cap Index Fund and replacing it with either the Vanguard or TIAA-CREF small cap index funds. Vanguard and TIAA-CREF had significantly more experience and expertise with indexing strategies and a superior reputation. The Vanguard funds also had lower tracking error rates, while the TIAA-CREF and American Beacon funds had similar tracking error rates.

109.    The conduct of fiduciaries of other similarly-sized plans demonstrates the imprudence of Defendants' retention of the American Beacon International Equity Index Fund.

---

[12] The Vanguard Small Cap Index Fund tracks the CRSP US Small Cap Index, unlike the other funds shown here, and therefore its returns will not mimic those of the Russell 2000 Index.

[13] Average rate of return data from 2010-14 cannot be calculated for the Vanguard Russell 2000 Index Fund because the Fund did not come into existence until December 2010. From 2011 to 2014, the Vanguard Russell 2000 Index Fund's average annual rate of return was 12.92%, while the average annual rate of return of the American Beacon Small Cap Index Fund was 12.79%.

As of the end of 2014, approximately 31 defined contribution plans with over $1 billion in assets held the TIAA-CREF Small Cap Blend Index Fund, and 121 defined contribution plans with over $1 billion in assets held the Vanguard Small Cap Index Fund.  In contrast, only one defined contribution plan with over $1 billion in assets held the American Beacon Small Cap Index Fund: the Plan.

110.    Each year, beginning in 2010, an impartial review of the Plan's investment options coupled with a minimal investigation of available alternatives would have led a prudent investor to remove the American Beacon S&P 500 Index Fund, the American Beacon International Equity Index Fund, and the American Beacon Small Cap Index Fund from the Plan, and replace them with lower-cost index funds from Vanguard, Fidelity, or TIAA-CREF. Defendants' failure to take this action constituted a breach of their fiduciary duties of prudence and loyalty.  *See Leber v. Citigroup 401(k) Plan Investment Committee*, 2014 WL 4851816, at *4 (S.D.N.Y. Sept. 30, 2014) ("Essential to the plausibility of plaintiffs' [breach of fiduciary duty] claims was the allegation that the [proprietary funds] charged higher fees than those charged by comparable Vanguard funds—in some instances fees that were more than 200 percent higher than those comparable funds.") (quotation and citation omitted).

111.    In the fourth quarter of 2015, Defendants belatedly removed the American Beacon index funds from the Plan and replaced them with significantly less expensive options that should have been made available in the Plan years earlier, effectively conceding the imprudence of those investment options.  Although the Plan eventually switched to different index options, Plan participants were not reimbursed for the excess fees they had been paying for the past several years.

IV.     **DEFENDANTS RETAINED POORLY PERFORMING AMERICAN BEACON FUNDS IN THE PLAN IN THEIR OWN SELF-INTEREST AND AT THE EXPENSE OF PLAN PARTICIPANTS**

112.    In addition to the Plan's retention of imprudent index funds, the Plan has retained several actively-managed American Beacon funds as Plan investment options despite the fact that these funds were clearly imprudent given their consistent and repeated underperformance compared to relevant benchmark indices.

113.    The fact that these funds were imprudent investment options is not merely evident with the benefit of hindsight.  Rather, it should have been evident from the information already available to Defendants at the relevant times that these funds were imprudently retained.  The fact that the Defendants retained these funds in spite of this contemporaneously-available evidence demonstrates that the process by which the Plan was managed was deeply flawed.  The examples discussed below (relating to the American Beacon Short-Term Bond Fund, American Beacon Large Cap Growth Fund, and the American Beacon Treasury Inflation Protected Securities Fund) are illustrative, and are just the tip of the iceberg of a systemically imprudent process for managing the Plan that improperly gave preference to American Beacon funds over other, more appropriate investment alternatives.

*American Beacon Short-Term Bond Fund*

114.    For example, as of the end of 2010, the Plan had approximately $109 million invested in the American Beacon Short-Term Bond Fund.  An impartial and prudent fiduciary reviewing the Plan in mid-2010 would have removed the American Beacon Short-Term Bond Fund.  The Fund had expenses of 0.33%, and had underperformed its benchmark index[14] over the

---

[14] The American Beacon Short-Term Bond Fund is a short-term bond fund.  The Barclays 1-5 Yr Govt/Credit Index is generally considered to be the appropriate benchmark index for evaluating the performance of short-term bond funds.  Morningstar data from the end of 2011 found that the

previous one-, three-, five-, and ten-year periods.  Moreover, the American Beacon Short-Term Bond Fund's problems worsened, as it underperformed its benchmark index in 2010 and 2011. A prudent fiduciary would have removed the Fund in mid-2010, and certainly by 2011, in light of its chronic underperformance.

115.    Better-performing, lower-cost options were available to the Plan.  Indeed, there were both actively- and passively-managed options available to Defendants that had lower expenses and offered superior investment management services. First, the Vanguard Short-Term Investment-Grade Fund is an actively-managed fund that had expenses of only 0.09% as of mid-2010, and had outperformed the American Beacon Short-Term Bond Fund over the prior one-, three-, five-, and ten-year periods.  Second, the Plan could have invested in the TIAA-CREF Short-Term Bond Fund, which had expenses of 0.29% as of mid-2010, and had outperformed the American Beacon Short-Term Bond Fund in the prior one- and three-year periods (the fund's inception date was in 2006, and therefore it did not yet have a 5-year performance history). Finally, the Vanguard Short-Term Bond Index Fund had expenses of 0.12% as of mid-2010,[15] provided performance that mimicked the Barclays 1-5 Year Government/Credit Bond Index, and had outperformed the American Beacon Short-Term Bond Fund over the prior one-, three-, and five-year periods.

---

Barclays 1-5 Yr Govt/Credit Index was the "Best Fit" index based on a regression analysis, meaning that the American Beacon Fund's holdings matched this particular index more closely than any other index.  However, the Fund's prospectus identified the Merrill Lynch 1-3 Year U.S. Corporate/Government Bond Index as its benchmark index.  The American Beacon Short-Term Bond Fund was also trailing this benchmark over the prior three-, five-, and ten-year periods.

[15] These expenses fell to 0.07% in September 2011 when Vanguard introduced an Institutional share class of the Short-Term Bond Index Fund.

116.    The conduct of fiduciaries of other similarly-sized plans demonstrates the imprudence of Defendants' retention of the American Beacon Short-Term Bond Fund.  As of the end of 2014, approximately 27 defined contribution plans with over $1 billion in assets held the Vanguard Investment-Grade Fund; 13 defined contribution plans with over $1 billion in assets held the TIAA-CREF Short-Term Bond Fund; and 36 defined contribution plans held the Vanguard Short-Term Bond Index Fund.  In contrast, 3 defined contribution plans with over $1 billion in assets held the American Beacon Short-Term Bond Fund.  The Plan was the only one of these three plans that held more than one one-hundredth of one percent of the Plan's assets in the American Beacon Short-Term Bond Fund.[16]

117.    An impartial and prudent fiduciary would have removed the American Beacon Short-Term Bond Fund in mid-2010, or by the end of 2010 or 2011 at the latest, given the Fund's underperformance and the availability of lower-cost, better-performing investment options. However, the Plan's fiduciaries failed to take this action until the fall of 2015, long after the fund had become imprudent.  The failure to timely remove the American Beacon Short-Term Bond Fund has cost participants millions of dollars in lost earnings they would have enjoyed had the Plan's fiduciaries moved to a more prudent short-term bond fund prior to the fall of 2015.

***American Beacon Large-Cap Growth Fund***

---

[16] The American Beacon Short-Term Bond Fund's inclusion in these other two funds is more a function of the idiosyncratic nature of each plan rather than the fund's prudence. The average defined-contribution plan contains 14 investment options, not including target-date funds. Callan Investments Institute, *2014 Defined Contribution Trends*, p. 28, https://www.callan.com/research/ files/753.pdf (last visited Nov. 20, 2015).  The $10.5 billion Shell Provident Fund offers 331 investment options, including six different short-term bond options; only $1.2 million of Plan assets are in the American Beacon Short-Term Bond Fund. The $3.8 billion MIT Supplemental Income 401(k) Plan offers 333 investment options, including six different short-term bond options; $85,945 of the plan's assets are in the American Beacon Short-Term Bond Fund.

118.     As another example, the Plan held the American Beacon Large Cap Growth Fund until it was liquidated in mid-2012.  Yet the fund clearly had become imprudent before it was liquidated.  As of mid-2010, the American Beacon Large Cap Growth Fund had underperformed its benchmark index[17] by at least three percent a year over the prior one-, three-, and five-year periods, had underperformed its benchmark index by over one percent per year over the past ten years, all while ranking in the bottom 30% of its category over all three time periods.  The American Beacon Large Cap Growth Fund's expenses as of mid-2010 were 0.63% per year.

119.     Better-performing and lower cost options were available to the Plan.  Indeed, there were multiple actively- and passively-managed options available to Defendants that had lower expenses and offered superior investment management services.  First, the Plan could have invested in the American Funds Growth Fund of America, an actively-managed large company growth mutual fund with annual expenses of 0.34% per year that had outperformed the American Beacon Large-Cap Growth Fund over the prior one-, three-, and five-year periods.  Second, the Vanguard Growth Index Fund is a passively-managed fund with annual expenses of 0.08% that mimicked the performance of the Russell 1000 Growth Index, and had outperformed the American Beacon Large-Cap Growth Fund over the prior one-, three-, and five-year periods.[18]

120.     An impartial and prudent fiduciary would have removed the American Beacon Large Cap Growth Fund from the Plan in mid-2010.  Instead, the Plan's fiduciaries failed to remove this fund from the Plan until it was closed in mid-2012, and in the subsequent two-year

---

[17] The appropriate benchmark index for the American Beacon Large Cap Growth Fund is the Russell 1000 Growth Index, the index most commonly used benchmark to track the performance of large company growth stocks and large company growth mutual funds.

[18] The American Beacon Large-Cap Growth Fund's inception date was in July 2000, so it did not have a ten-year performance history as of mid-2010.  By the end of 2010, the American Funds Growth Fund of America and the Vanguard Growth Index had significantly outperformed the American Beacon Large-Cap Growth fund over the prior ten years.

period, the American Beacon Large Cap Growth Fund continued to underperform its benchmark index by at least four percent per year, costing Plan participants millions of dollars in lost earnings.

### American Beacon Treasury Inflation Protected Securities Fund

121.    As a third example, the Plan had approximately $107 million invested in the American Beacon Treasury Inflation Protected Securities Fund (hereinafter "American Beacon TIPS Fund") as of the end of 2009.  An impartial and prudent fiduciary reviewing the Plan in mid-2010 would have opted to remove the American Beacon TIPS Fund. The Fund had expenses of 0.26%, and had underperformed its benchmark index[19] over the prior one-, three-, and five-year periods.   Moreover, the American Beacon TIPS Fund's problems worsened, as it underperformed its benchmark index by significant amounts in 2010, 2011, and 2012. A prudent fiduciary would have removed the Fund at in mid-2010, and certainly by 2011, in light of the Fund's chronic underperformance and relatively high costs.

122.    Better-performing, lower-cost options were available to the Plan. Indeed, there were multiple actively- and passively-managed options available to Defendants that had lower expenses and offered superior investment management services.  First, the Vanguard Inflation-Protected Securities Fund is an actively-managed fund with expenses of only .09% (roughly one-third the expenses of the American Beacon TIPS Fund) that had outperformed the American Beacon TIPS Fund over the prior one-, three-, and five-year periods.  Second, the DFA Inflation-Protected Securities Fund had expenses of 0.16% and had outperformed the American Beacon

---

[19] Plaintiffs are referring to the Barclays U.S. Treasury Inflation Protected Securities Index, an index designed to track the performance of treasury inflation-protected securities, commonly known as "TIPS".  This is one of two indices commonly used to track TIPS, the other being the Morningstar TIPS Index.  The American Beacon TIPS Fund underperformed both indices over all relevant time periods by a significant margin.

TIPS Fund over the prior one and three year periods.[20]  Finally, the Plan could have invested in the SSgA U.S. Inflation-Protected Bond Index passively-managed collective trust product offered by State Street that would have had expenses of between 0.04% and 0.07%, and provided performance that mimicked the performance of the Barclays U.S. Treasury Inflation Protected Securities Index, and had outperformed the American Beacon TIPS Fund over the prior one-, three-, and five-year time periods.

123.    The conduct of fiduciaries of other similarly-sized plans demonstrates the imprudence of Defendants' retention of the American Beacon TIPS Fund. As of the end of 2014, approximately 115 defined contribution plans with over $1 billion in assets held the Vanguard Inflation-Protected Securities Fund; 22 defined contribution plans with over $1 billion in assets held the SSgA U.S. Inflation Protected Bond Index collective trust; and 3 plans with over $1 billion in assets owned the DFA Inflation-Protected Securities Fund.  In contrast, only one defined contribution plan with over $1 billion in assets held the American Beacon TIPS Fund: the Plan.

124.    An impartial and prudent fiduciary would have removed the American Beacon TIPS Fund in mid-2010, or by the end of 2010 or 2011 at the latest, given its consistent underperformance and the availability of lower-cost, better-performing investment options. However, the Plan's fiduciaries failed to take this action until the fall of 2015, long after the fund had become imprudent.  The failure to timely remove the American Beacon TIPS Fund cost

---

[20] The inception date of the DFA Inflation-Protected Securities Fund is Sept. 18, 2006.  It therefore did not have a five-year average rate of return as of mid-2010. However, as of the end of 2011, the DFA Inflation-Protected Securities Fund had outperformed the American Beacon TIPS Fund by approximately 2.4% **per year** over the past five years.

participants millions of dollars in lost earnings they would have enjoyed had the Plan's fiduciaries moved to a more prudent inflation-protected security fund.

125.    Based on the above facts, it is apparent that Defendants' process for reviewing Plan investments was deeply flawed, and improperly favored American Beacon funds.  Prior to the fall of 2015, Defendants only removed one American Beacon fund (the Large Cap Growth Fund) from the Plan when they were forced to do so because the fund was liquidated. Only after Lighthouse Holdings, Inc. had sold American Beacon Funds, eliminating American Airlines' parent's stake in American Beacon Funds as well as its contractual obligation to retain American Beacon Funds in the Plan, did Defendants overhaul the Plan and remove all American Beacon Funds.  But this action was taken many years after a prudent and impartial fiduciary would have removed many of the American Beacon Funds from the Plan.  Defendants also failed to periodically re-assess the long-term performance record of each Plan investment to ensure that the investment remained prudent.  Accordingly, it can be reasonably inferred that the process by which the Plan was managed was flawed.  *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 596 (8th Cir. 2009) (evidence that the investments held by the plan were imprudent permits a plausible inference that "the process by which [defendants] selected and managed the funds in the Plan [was] tainted by failure of effort, competence, or loyalty").

126.    Had Defendants prudently monitored the investments within the Plan, in a process that was not tainted by self-interest, they would have expeditiously removed numerous American Beacon mutual funds (including the above-referenced funds) from the Plan in favor of more prudent alternatives.  Instead, Defendants retained the American Beacon funds either out of contractual obligation or because the funds were generating revenue for American Airlines'

parent corporation.  By prioritizing American Airlines' interests over those of Plan participants, Defendants breached their fiduciary duties of loyalty and prudence.

## V. DEFENDANTS FAILED TO INVESTIGATE THE USE OF SEPARATE ACCOUNTS AND COLLECTIVE TRUSTS

127.    Aside from selecting proprietary mutual funds that charged excessive fees and had a track record of poor performance, Defendants also failed to adequately investigate non-mutual fund alternatives such as collective trusts and separately managed accounts.

128.    According to the United States Department of Labor, separate accounts, which require a minimum investment of $15 million to $25 million per account, are available to "large plans … with total assets of over $500 million[.]"  *Study of 401(k) Plan Fees and Expenses*, April 13, 1998.  By using separate accounts, "[t]otal investment management expenses can commonly be reduced to one-fourth of the expenses incurred through retail mutual funds."  *Id*.

129.    Collective trusts also typically have much lower investment management fees than mutual funds. Collective trusts are a common investment vehicle in large 401(k) plans, and are accessible even to midsize plans with $100 million in assets or more.  Anne Tergesen, *401(k)s Take a New Tack*, WALL ST. J. (Sept. 25, 2015), *available at* http://www.wsj.com/articles/some-funds-in-your-401-k-arent-really-mutual-funds-after-all-1443173400.  Because they are not subject to the registration requirements of mutual funds, collective trusts incur much lower administrative costs.  Robert Steyer, *Use of CITs in DC Plans Booming, Rises 68% since 2008*, PENSIONS & INVESTMENTS (Feb. 22, 2016), *available at* http://www.pionline.com/article/20160222/PRINT/302229985/use-of-cits-in-dc-plans-booming-rises-68-since-2008.  And because fees can be negotiated, large plans such as the Plan can use their leverage and bargaining power to obtain much lower fees. *Id.*

130.    Accordingly, for plans of this size, collective trusts and separate accounts have become the norm.  In 2012, more money was held in collective trusts than in mutual funds.  ICI Study at 21, 23.  By 2015, in plans with over $5 billion in assets (such as the Plan),[21] 88% of assets were held in separate accounts or collective trusts, while less than 12% was held in mutual funds.  *Id.*

131.    While the Plan's investment options generally utilized institutional share classes, costs within separate accounts and collective trusts are typically much lower than even the institutional share class of mutual funds.

132.    The advantages that could have been realized over the past several years had the Plan shifted to collective trusts or separate accounts are perhaps best evidenced by the Plan itself. Near the end of 2015, the Plan eliminated nearly all mutual funds from the Plan, instead using collective trust vehicles.  The change reduced the cost of the Plan's intermediate bond option by roughly 40%.  The cost of the Plan's TIPS option fell by over 90%.  And without making any change to the manager, the expenses within the Plan's large cap value investment option fell by 20%.

133.    Defendants should have used the Plan's bargaining power to obtain high-quality, low-cost alternatives to mutual funds, in order to negotiate the best possible price for the Plan.  A prudent fiduciary managing a Plan with between $5 billion and $10 billion in assets would have investigated the use of separate accounts and collective trusts many years earlier, and would have switched from mutual funds to collective trusts because of the immense cost savings that would have been enjoyed, without any adverse change to the quality of the investment management

---

[21] The Plan had approximately $7.1 billion in assets as of the end of 2010, and      approximately $9.1 billion in assets as of the end of 2014.

services being provided.  By failing to investigate the use of these alternatives for the Plan's actively managed funds, Defendants caused the Plan to pay millions of dollars per year in unnecessary fees.

134.   Defendants were fully aware that such high-quality, low-cost alternatives to mutual funds were available to the Plan, and were willing to use these alternatives when it benefited their bottom line. Defendants also administered multiple pension plans for certain groups of American Airlines employees such as pilots or baggage handlers.  Employers such as American Airlines have a strong incentive to control costs for their defined benefit plans, given that they are responsible for paying investment management expenses, and are also liable for any shortfall caused by poor investment returns or investment management fees.  These incentives do not exist in defined contribution plans, because participants bear all investment management expenses, and also bear all risk related to investment underperformance.  Predictably, American Airlines was careful to minimize costs for its pension plan by taking advantage of separate accounts. Had Defendants acted with the same degree of prudence in managing the Plan as they used in managing American Airlines' defined benefit plan, they also would have utilized separate accounts in connection with the 401(k) Plan.

## VI.   PLAINTIFFS DID NOT HAVE KNOWLEDGE OF DEFENDANTS' FIDUCIARY BREACHES

135.   Plaintiffs did not have knowledge of all material facts (including but not limited to the cost of other available index funds, the relative non-competitiveness of the Plan's investment options compared to available alternatives, and information regarding separate accounts and collective trusts) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA, until shortly before this suit was filed.  Further, Plaintiffs do not have actual knowledge of the specifics of Defendants' decision-making processes with respect to the Plan, including Defendants' processes for

selecting, monitoring, and removing Plan investments, and whether these processes provided preferential treatment to American Beacon funds, because this information is solely within the possession of Defendants prior to discovery.  For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth above.

**CLASS ACTION ALLEGATIONS**

136.    29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to recover for the Plan the remedies provided by 29 U.S.C. § 1109(a).  Plaintiffs seek certification of this action as a class action pursuant to this statutory provision and Fed. R. Civ. P. 23.

137.    Plaintiffs Whitney Main, Henry Schmidt, and Daniel Grentz assert their claims against Defendants on behalf of a class of participants and beneficiaries of the Plan defined as follows:[22]

> All participants and beneficiaries of the American Airlines, Inc. 401(k) Plan (formerly known as $uper $aver Capital Accumulation Plan for Employees of Participating AMR Corporation Subsidiaries) at any time on or after April 15, 2010, excluding Defendants, any of their directors, and any officers or employees of Defendants with responsibility for the Plan's investment or administrative functions.

138.    Numerosity:   The Class is so numerous that joinder of all Class members is impracticable.  The Plan has had between 75,000 and 90,000 participants with account balances during the applicable period.

139.    Typicality:    Plaintiffs' claims are typical of the Class members' claims.  Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of

---

[22] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

Defendants' mismanagement of the Plan.  Defendants treated Plaintiffs consistently with other Class members with regard to the Plan.  Defendants managed the Plan as a single entity, and therefore Defendants' imprudent decisions affected all Plan participants similarly.

140.    <u>Adequacy</u>:    Plaintiffs will fairly and adequately protect the interests of the Class.  Plaintiffs' interests are aligned with the Class that they seek to represent, and they have retained counsel experienced in complex class action litigation.  Plaintiffs do not have any conflicts of interest with any Class members that would impair or impede their ability to represent such Class members.

141.    <u>Commonality</u>:  Common questions of law and fact exist as to all Class members, and predominate over any questions solely affecting individual Class members, including but not limited to:

a.   Which Defendants are fiduciaries of the Plan;

b.   Whether the Plan's fiduciaries breached their fiduciary duties by engaging in the conduct described herein;

c.   Whether the Plan's fiduciaries are additionally or alternatively liable, as co-fiduciaries, for the unlawful conduct described herein pursuant to 29 U.S.C. § 1105;

d.   Whether American Airlines, the PBAC (and its members), the BSC (and its members), and the EBC (and its members) breached their duty to monitor the Plan's fiduciaries to ensure the Plan was being managed in compliance with ERISA;

e.   The proper form of equitable and injunctive relief; and

f.   The proper measure of monetary relief.

142.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

143.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.   Any award of equitable relief by the Court, such as removal of particular Plan investments or removal of a Plan fiduciary, would be dispositive of non-party participants' interests.   The accounting and restoration of the property of the Plan that would be required under 29 U.S.C. §§ 1109 and 1132 would be similarly dispositive of the interests of other Plan participants.

144.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation.   Defendants' conduct as described in this Complaint applied uniformly to all members of the Class.   Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiffs are unaware of any similar claims brought against Defendants by any Class members on an individual basis.   Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices.   Moreover, management of this action as a class action will not present any likely difficulties.   In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

## COUNT I
### Breach of Duties of Loyalty and Prudence
### 29 U.S.C. § 1104(a)(1)(A)–(B)

145.    American Airlines, American Beacon, the PBAC, PAAC, BSC, EBC, and the Individual Defendants are or were fiduciaries of the Plan during the relevant period under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

146.    29 U.S.C. § 1104 imposes fiduciary duties of prudence and loyalty upon Defendants in their administration of the Plan and in their selection and monitoring of Plan investments.

147.    The scope of the fiduciary duties and responsibilities of Defendants includes managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, defraying reasonable expenses of administering the plan, and acting with the care, skill, diligence, and prudence required by ERISA.   Further, Defendants are or were directly responsible for ensuring that the Plan's fees are reasonable, selecting and retaining prudent investment options, evaluating and monitoring the Plan's investments on an ongoing basis and eliminating imprudent ones, and taking all necessary steps to ensure that the Plan's assets are invested prudently.   This duty includes "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble*, 135 S. Ct. at 1829.

148.    As described throughout this Complaint, Defendants failed to monitor the Plan's investments to ensure that each of the Plan's investments remained prudent, and failed to remove those investments that were no longer prudent.   Defendants imprudently and disloyally retained American Beacon index funds as Plan investments despite the availability of identical investments from other mutual fund companies that are widely-utilized and would have cost Plan participants up to eight times less.   Defendants also imprudently and disloyally retained several actively-managed American Beacon funds despite their known poor performance history relative

to their benchmark indices and to other similar investments that were available in the marketplace.  Further, Defendants failed to investigate the availability of separate accounts and collective trusts as alternatives to the mutual funds within the Plan, and failed to transfer from mutual funds into a separate account or collective trust structure in a timely manner even though doing so would have saved Plan participants millions of dollars in fees.  A prudent fiduciary acting in the best interests of Plan participants would not have engaged in these acts and omissions.

149.    Each of the above-mentioned imprudent actions and failures to act in a prudent manner illustrate Defendants' failure to monitor the Plan and make Plan investment decisions based solely on the merits of each investment and what was in the interest of Plan participants. Instead, Defendants' conduct and decisions were influenced by their desire to drive revenues and profits to American Airlines its parent corporation, and American Beacon.  Through these actions and omissions, Defendants failed to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries of the Plan, and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the Plan, in violation of their fiduciary duty of loyalty under 29 U.S.C. § 1104(a)(1)(A).

150.    Through the actions and omissions described *supra* in paragraph 148 and elsewhere in this Complaint, Defendants also failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, thereby breaching their duties under 29 U.S.C. § 1104(a)(1)(B).

151.     Each Defendant is personally liable, and Defendants are jointly and severally liable, under 29 U.S.C. §§ 1109(a), 1132(a)(2), and (a)(3), and to make good to the Plan the losses resulting from the aforementioned breaches.

152.     Each Defendant knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.   Accordingly, each Defendant is also liable for the losses caused by the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

153.     Additionally, each Defendant who employed another Defendant or Defendants for the purpose of carrying out one or more of the fiduciary duties described herein on behalf of the Plan is vicariously liable under the doctrine of respondeat superior.   American Airlines, through its corporate officer, employed the BSC, EBC, PAAC, PBAC, and the Individual Defendants, and directed them to take actions as necessary to delegate, coordinate, effect, or maintain the investment of Plan assets.   American Airlines provided each of these Defendants access to the Plan and the authority to act on behalf of the Plan in carrying out the responsibilities prescribed. Likewise, pursuant to the Plan documents, the BSC employed the PAAC and PBAC and their constituent members or agents, and the EBC employed its constituent members, with such direction, access, and authority as necessary to drive the investment of Plan assets.   The improvident investment decisions and abdication of responsibility for corrective action or oversight by each Defendant employed by another occurred within the scope of that employment, and vicarious liability attaches accordingly.

<u>**COUNT II**</u>
**Failure to Monitor Fiduciaries**

154.    As alleged throughout the Complaint, American Airlines, the BSC, and the members of the BSC (Beverly Goulet, Jeffrey Brudage, Tom Del Valle, Elise Eberwein, Daniel Garton, Bella Goren, Thomas Horton, Stephen Johnson, Derek Kerr, Craig Kreeger, Denise Lynn, Jim Ream, Robert Reding, Jon Snook, and Virasb Vahidi), are or were fiduciaries of the Plan whose duties included a duty to appoint and remove members of a committee or a duty to monitor the performance of other Plan fiduciaries.

155.    The BSC and its members, and American Airlines, through its corporate officers, were responsible for appointing and removing members of the PBAC, PAAC, and EBC.  This carried with it a duty to monitor the performance of the fiduciaries being appointed, and to ensure that they were performing their duties properly and in accordance with ERISA.

156.    A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and monitoring of plan assets, and must take prompt and effective action to protect the plan and participants when the monitored fiduciaries fail to perform their fiduciary obligations in accordance with ERISA.

157.    To the extent that American Airlines, the BSC, or its members delegated their fiduciary monitoring responsibilities, each Defendant's monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

158.    American Airlines, the BSC, and its members breached their fiduciary monitoring duties by, among other things:

        a)    Failing to monitor and evaluate the performance of the Plan's fiduciaries or have a system in place for doing so, standing idly by as the Plan suffered

enormous losses as a result of the other Defendants' imprudent actions and omissions;

b)  failing to monitor the processes by which Plan investments were evaluated, which would have alerted a prudent fiduciary to the preferential treatment the Plan's fiduciaries were giving to American Beacon-affiliated mutual funds in their process of selecting and monitoring the Plan's investments; the fiduciaries' failure to investigate the availability of lower-cost separate account and collective trust vehicles; and the failure to investigate in a timely fashion the availability of lower-cost alternatives to the American Beacon index funds held by the Plan;

c)  failing to remove fiduciaries whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, all to the detriment of the Plan and Plan participants' retirement savings.

159.   As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars per year in losses due to excessive fees and investment underperformance.

160.   Pursuant to 29 U.S.C. § 1109(a), 1132(a)(2), and 1132(a)(3), American Airlines, the BSC, and its members are liable to restore to the Plan all losses suffered as a result of the fiduciary breaches that resulted from their failure to properly monitor the Plan's fiduciaries.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Main, Schmidt, and Grentz, individually and as representatives of the Class defined herein, and on behalf of the Plan, pray for relief as follows:

A. A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(3) of the Federal Rules of Civil Procedure;

B. Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C. A declaration that Defendants have breached their fiduciary duties under ERISA;

D. An order compelling Defendants to personally make good to the Plan all losses that the Plan incurred as a result of the breaches of fiduciary duties described above, and to restore the Plan to the position it would have been in but for this unlawful conduct;

E. An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

F. Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan; transfer of Plan assets out of imprudent investments into prudent alternatives; and removal of Plan fiduciaries deemed to have breached their fiduciary duties and/or engaged in prohibited transactions;

G. An award of pre-judgment interest;

H. An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the common fund doctrine;

I. An award of such other and further relief as the Court deems equitable and just.


Dated: November 16, 2016                    **NICHOLS KASTER, PLLP**

                                            /s/ Kai H. Richter
                                            Kai H. Richter, MN Bar No. 0296545*
                                            Carl F. Engstrom, MN Bar No. 0396298*
                                                    * admitted *pro hac vice*
                                            4600 IDS Center
                                            80 S 8th Street
                                            Minneapolis, MN 55402
                                            Telephone: 612-256-3200
                                            Facsimile: 612-338-4878
                                            krichter@nka.com

cengstrom@nka.com


**KENDALL LAW GROUP, PLLC**
JOE KENDALL
Texas Bar No. 11260700
JODY RUDMAN
Texas Bar No. 00797356
3232 McKinney Avenue, Suite 700
Dallas, Texas  75204
214-744-3000 / 214-744-3015 (Facsimile)
jkendall@kendalllawgroup.com
jrudman@kendalllawgroup.com


ATTORNEYS FOR PLAINTIFFS